# CHAMBERS *v.* MISSISSIPPI

No. 71–5908. Argued November 15, 1972—
Decided February 21, 1973

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and DOUGLAS, BRENNAN, STEWART, WHITE, MARSHALL, and BLACKMUN, JJ., joined. WHITE, J., filed a concurring opinion, *post,* p. 303. REHNQUIST, J., filed a dissenting opinion, *post,* p. 308.

*Peter Westen* argued the cause for petitioner *pro hac vice*. With him on the briefs was *Ramsey Clark*.

*Timmie Hancock*, Special Assistant Attorney General of Mississippi, argued the cause for respondent. With him on the brief were *A. F. Summer*, Attorney General, and *Guy N. Rogers*, Assistant Attorney General.

MR. JUSTICE POWELL delivered the opinion of the Court.

Petitioner, Leon Chambers, was tried by a jury in a Mississippi trial court and convicted of murdering a policeman. The jury assessed punishment at life imprisonment, and the Mississippi Supreme Court affirmed, one justice dissenting. 252 So. 2d 217 (1971). Pending disposition of his application for certiorari to this Court, petitioner was granted bail by order of the Circuit Justice, dated February 1, 1972. Two weeks later, on the State's request for reconsideration, that order was reaffirmed. 405 U. S. 1205 (1972). Subsequently, the petition for certiorari was granted, 405 U. S. 987 (1972), to consider whether petitioner's trial was conducted in accord with principles of due process under the Fourteenth Amendment. We conclude that it was not.

I

The events that led to petitioner's prosecution for murder occurred in the small town of Woodville in southern Mississippi. On Saturday evening, June 14, 1969, two Woodville policemen, James Forman and Aaron "Sonny" Liberty, entered a local bar and pool hall to execute a warrant for the arrest of a youth named C. C. Jackson. Jackson resisted and a hostile crowd of some 50 or 60 persons gathered. The officers' first attempt to handcuff Jackson was frustrated when 20 or 25 men in the crowd intervened and wrestled him

free. Forman then radioed for assistance and Liberty removed his riot gun, a 12-gauge sawed-off shotgun, from the car. Three deputy sheriffs arrived shortly thereafter and the officers again attempted to make their arrest. Once more, the officers were attacked by the onlookers and during the commotion five or six pistol shots were fired. Forman was looking in a different direction when the shooting began, but immediately saw that Liberty had been shot several times in the back. Before Liberty died, he turned around and fired both barrels of his riot gun into an alley in the area from which the shots appeared to have come. The first shot was wild and high and scattered the crowd standing at the face of the alley. Liberty appeared, however, to take more deliberate aim before the second shot and hit one of the men in the crowd in the back of the head and neck as he ran down the alley. That man was Leon Chambers.

Officer Forman could not see from his vantage point who shot Liberty or whether Liberty's shots hit anyone. One of the deputy sheriffs testified at trial that he was standing several feet from Liberty and that he saw Chambers shoot him. Another deputy sheriff stated that, although he could not see whether Chambers had a gun in his hand, he did see Chambers "break his arm down" shortly before the shots were fired. The officers who saw ·Chambers fall testified that they thought he was dead but they made no effort at that time either to examine him or to search for the murder weapon. Instead, they attended to Liberty, who was placed in the police car and taken to a hospital where he was declared dead on arrival. A subsequent autopsy showed that he had been hit with four bullets from a .22-caliber revolver.

Shortly after the shooting, three of Chambers' friends

discovered that he was not yet dead. James Williams,[1] Berkley Turner, and Gable McDonald loaded him into a car and transported him to the same hospital. Later that night, when the county sheriff discovered that Chambers was still alive, a guard was placed outside his room. Chambers was subsequently charged with Liberty's murder. He pleaded not guilty and has asserted his innocence throughout.

The story of Leon Chambers is intertwined with the story of another man, Gable McDonald. McDonald, a lifelong resident of Woodville, was in the crowd on the evening of Liberty's death. Sometime shortly after that day, he left his wife in Woodville and moved to Louisiana and found a job at a sugar mill. In November of that same year, he returned to Woodville when his wife informed him that an acquaintance of his, known as Reverend Stokes, wanted to see him. Stokes owned a gas station in Natchez, Mississippi, several miles north of Woodville, and upon his return McDonald went to see him. After talking to Stokes, McDonald agreed to make a statement to Chambers' attorneys, who maintained offices in Natchez. Two days later, he appeared at the attorneys' offices and gave a sworn confession that he shot Officer Liberty. He also stated that he had already told a friend of his, James Williams, that he shot Liberty. He said that he used his own pistol, a nine-shot .22-caliber revolver, which he had discarded shortly after the shooting. In response to questions from Chambers' attorneys, McDonald affirmed that his confession was voluntary and that no one had compelled him to come to them. Once the confession had been transcribed,

---

[1] James Williams was indicted along with Chambers. The State, however, failed to introduce any evidence at trial implicating Williams in the shooting. At the conclusion of the State's case-in-chief, the trial court granted a directed verdict in his favor.

signed, and witnessed, McDonald was turned over to the local police authorities and was placed in jail.

One month later, at a preliminary hearing, McDonald repudiated his prior sworn confession. He testified that Stokes had persuaded him to confess that he shot Liberty. He claimed that Stokes had promised that he would not go to jail and that he would share in the proceeds of a lawsuit that Chambers would bring against the town of Woodville. On examination by his own attorney and on cross-examination by the State, McDonald swore that he had not been at the scene when Liberty was shot but had been down the street drinking beer in a cafe with a friend, Berkley Turner. When he and Turner heard the shooting, he testified, they walked up the street and found Chambers lying in the alley. He, Turner, and Williams took Chambers to the hospital. McDonald further testified at the preliminary hearing that he did not know what had happened, that there was no discussion about the shooting either going to or coming back from the hospital, and that it was not until the next day that he learned that Chambers had been felled by a blast from Liberty's riot gun. In addition, McDonald stated that while he once owned a .22-caliber pistol he had lost it many months before the shooting and did not own or possess a weapon at that time. The local justice of the peace accepted McDonald's repudiation and released him from custody. The local authorities undertook no further investigation of his possible involvement.

Chambers' case came on for trial in October of the next year.[2] At trial, he endeavored to develop two

---

[2] Upon Chambers' motion, a change of venue was granted and the trial was held in Amite County, to the east of Woodville. The change of trial setting was in response to petitioner's claim that, because of adverse publicity and the hostile attitude of the police and sheriff's staffs in Woodville, he could not obtain a fair and impartial trial there.

grounds of defense. He first attempted to show that he did not shoot Liberty. Only one officer testified that he actually saw Chambers fire the shots. Although three officers saw Liberty shoot Chambers and testified that they assumed he was shooting his attacker, none of them examined Chambers to see whether he was still alive or whether he possessed a gun. Indeed, no weapon was ever recovered from the scene and there was no proof that Chambers had ever owned a .22-caliber pistol. One witness testified that he was standing in the street near where Liberty was shot, that he was looking at Chambers when the shooting began, and that he was sure that Chambers did not fire the shots.

Petitioner's second defense was that Gable McDonald had shot Officer Liberty. He was only partially successful, however, in his efforts to bring before the jury the testimony supporting this defense. Sam Hardin, a lifelong friend of McDonald's, testified that he saw McDonald shoot Liberty. A second witness, one of Liberty's cousins, testified that he saw McDonald immediately after the shooting with a pistol in his hand. In addition to the testimony of these two witnesses, Chambers endeavored to show the jury that McDonald had repeatedly confessed to the crime. Chambers attempted to prove that McDonald had admitted responsibility for the murder on four separate occasions, once when he gave the sworn statement to Chambers' counsel and three other times prior to that occasion in private conversations with friends.

In large measure, he was thwarted in his attempt to present this portion of his defense by the strict application of certain Mississippi rules of evidence. Chambers asserts in this Court, as he did unsuccessfully in his motion for new trial and on appeal to the State Supreme Court, that the application of these evidentiary rules ren-

dered his trial fundamentally unfair and deprived him of due process of law.[3] It is necessary, therefore, to examine carefully the rulings made during the trial.

---

[3] On the record in this case, despite the State Supreme Court's failure to address the constitutional issue, it is clear that Chambers' asserted denial of due process is properly before us. He objected during trial to each of the court's rulings. As to the confrontation claim, petitioner asserted, both before and during trial, his right to treat McDonald as an adverse witness. His motion for new trial, filed after the jury's verdict, listed as error the trial court's refusal to permit cross-examination of McDonald and the exclusion of evidence corroborative of McDonald's guilt. The motion concluded that the trial "was not in accord with fundamental fairness guaranteed by the Fourteenth Amendment of the Constitution." Chambers reasserted those claims on appeal to the State Supreme Court. After the affirmance of his conviction by that court, Chambers filed a petition for rehearing addressed almost entirely to the claim that his trial had not been conducted in a manner consistent with traditional notions of due process. The State Supreme Court raised no question that Chambers' claims were not properly asserted, and no claim has been made by the State—in its response to the petition for certiorari, in its brief on the merits, or at oral argument—that the questions are not properly reviewable by this Court. See *Street* v. *New York*, 394 U. S. 576, 581–585 (1969); *New York ex rel. Bryant* v. *Zimmerman*, 278 U. S. 63, 67–68 (1928).

Unlike *Henry* v. *Mississippi*, 379 U. S. 443 (1965), this case does not involve the state procedural requirement of contemporaneous objection to the admission of evidence. Petitioner's contention, asserted before the trial court on motion for new trial and subsequently before the Mississippi Supreme Court, is that he was denied "fundamental fairness guaranteed by the Fourteenth Amendment" as a result of several evidentiary rulings. His claim, the substance of which we accept in this opinion, rests on the cumulative effect of those rulings in frustrating his efforts to develop an exculpatory defense. Although he objected to each ruling individually, petitioner's constitutional claim—based as it is on the cumulative impact of the rulings—could not have been raised and ruled upon prior to the conclusion of Chambers' evidentiary presentation. Since the State has not asserted any independent state procedural ground as a basis for not reaching the merits of petitioner's constitutional claim, we have no occasion to decide whether—if such a ground

## II

Chambers filed a pretrial motion requesting the court to order McDonald to appear. Chambers also sought a ruling at that time that, if the State itself chose not to call McDonald, he be allowed to call him as an adverse witness. Attached to the motion were copies of McDonald's sworn confession and of the transcript of his preliminary hearing at which he repudiated that confession. The trial court granted the motion requiring McDonald to appear but reserved ruling on the adverse-witness motion. At trial, after the State failed to put McDonald on the stand, Chambers called McDonald, laid a predicate for the introduction of his sworn out-of-court confession, had it admitted into evidence, and read it to the jury. The State, upon cross-examination, elicited from McDonald the fact that he had repudiated his prior confession. McDonald further testified, as he had at the preliminary hearing, that he did not shoot Liberty, and that he confessed to the crime only on the promise of Reverend Stokes that he would not go to jail and would share in a sizable tort recovery from the town. He also retold his own story of his actions on the evening of the shooting, including his visit to the cafe down the street, his absence from the scene during the critical period, and his subsequent trip to the hospital with Chambers.

At the conclusion of the State's cross-examination, Chambers renewed his motion to examine McDonald as an adverse witness. The trial court denied the motion, stating: "He may be hostile, but he is not adverse in the sense of the word, so your request will be overruled." On appeal, the State Supreme Court upheld the trial

exists—its imposition in this case would serve any "legitimate state interest." *Id.,* at 447. Under these circumstances, we cannot doubt the propriety of our exercise of jurisdiction.

court's ruling, finding that "McDonald's testimony was not adverse to appellant" because "[n]owhere did he point the finger at Chambers." 252 So. 2d, at 220.

Defeated in his attempt to challenge directly McDonald's renunciation of his prior confession, Chambers sought to introduce the testimony of the three witnesses to whom McDonald had admitted that he shot the officer. The first of these, Sam Hardin, would have testified that, on the night of the shooting, he spent the late evening hours with McDonald at a friend's house after their return from the hospital and that, while driving McDonald home later that night, McDonald stated that he shot Liberty. The State objected to the admission of this testimony on the ground that it was hearsay. The trial court sustained the objection.[4]

Berkley Turner, the friend with whom McDonald said he was drinking beer when the shooting occurred, was then called to testify. In the jury's presence, and without objection, he testified that he had not been in the cafe that Saturday and had not had any beers with McDonald. The jury was then excused. In the absence of the jury, Turner recounted his conversations with McDonald while they were riding with James Williams to take Chambers to the hospital. When asked whether McDonald said anything regarding the shooting of Liberty, Turner testified that McDonald told him that he "shot him." Turner further stated that one week later, when he met McDonald at a friend's house, McDonald reminded him of their prior conversation and urged Turner not to "mess him up." Petitioner argued to the court that, especially where there was other proof

---

[4] Hardin's testimony, unlike the testimony of the other two men who stated that McDonald had confessed to them, was actually given in the jury's presence. After the State's objection to Hardin's account of McDonald's statement was sustained, the trial court ordered the jury to disregard it.

in the case that was corroborative of these out-of-court statements, Turner's testimony as to McDonald's self-incriminating remarks should have been admitted as an exception to the hearsay rule. Again, the trial court sustained the State's objection.

The third witness, Albert Carter, was McDonald's neighbor. They had been friends for about 25 years. Although Carter had not been in Woodville on the evening of the shooting, he stated that he learned about it the next morning from McDonald. That same day, he and McDonald walked out to a well near McDonald's house and there McDonald told him that he was the one who shot Officer Liberty. Carter testified that McDonald also told him that he had disposed of the .22-caliber revolver later that night. He further testified that several weeks after the shooting, he accompanied McDonald to Natchez where McDonald purchased another .22 pistol to replace the one he had discarded.[5] The jury was not allowed to hear Carter's testimony. Chambers urged that these statements were admissible, the State objected, and the court sustained the objection.[6] On appeal, the State Supreme Court approved the lower court's exclusion of these witnesses' testimony on hearsay grounds. 252 So. 2d, at 220.

---

[5] A gun dealer from Natchez testified that McDonald had made two purchases. The witness' business records indicated that McDonald purchased a nine-shot .22-caliber revolver about a year prior to the murder. He purchased a different style .22 three weeks after Liberty's death.

[6] It is not entirely clear whether the trial court's ruling was premised on the same hearsay rationale underlying the exclusion of the other testimony. In this instance, the State argued that Carter's testimony was an impermissible attempt by petitioner to impeach a witness (McDonald) who was not adverse to him. The trial court did not state why it was excluding the evidence but the State Supreme Court indicated that it was excluded as hearsay. 252 So. 2d, at 220.

In sum, then, this was Chambers' predicament. As a consequence of the combination of Mississippi's "party witness" or "voucher" rule and its hearsay rule, he was unable either to cross-examine McDonald or to present witnesses in his own behalf who would have discredited McDonald's repudiation and demonstrated his complicity. Chambers had, however, chipped away at the fringes of McDonald's story by introducing admissible testimony from other sources indicating that he had not been seen in the cafe where he said he was when the shooting started, that he had not been having beer with Turner, and that he possessed a .22 pistol at the time of the crime. But all that remained from McDonald's own testimony was a single written confession countered by an arguably acceptable renunciation. Chambers' defense was far less persuasive than it might have been had he been given an opportunity to subject McDonald's statements to cross-examination or had the other confessions been admitted.

## III

The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations. The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process. Mr. Justice Black, writing for the Court in *In re Oliver,* 333 U. S. 257, 273 (1948), identified these rights as among the minimum essentials of a fair trial:

> "A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense—a right to his day in court—are basic in our system of jurisprudence; and these rights include, as a minimum, a right to examine the witnesses against him, to offer testimony, and to be represented by counsel."

See also *Morrissey* v. *Brewer*, 408 U. S. 471, 488–489 (1972); *Jenkins* v. *McKeithen*, 395 U. S. 411, 428–429 (1969); *Specht* v. *Patterson*, 386 U. S. 605, 610 (1967). Both of these elements of a fair trial are implicated in the present case.

## A

Chambers was denied an opportunity to subject McDonald's damning repudiation and alibi to cross-examination. He was not allowed to test the witness' recollection, to probe into the details of his alibi, or to "sift" his conscience so that the jury might judge for itself whether McDonald's testimony was worthy of belief. *Mattox* v. *United States*, 156 U. S. 237, 242–243 (1895). The right of cross-examination is more than a desirable rule of trial procedure. It is implicit in the constitutional right of confrontation, and helps assure the "accuracy of the truth-determining process." *Dutton* v. *Evans*, 400 U. S. 74, 89 (1970); *Bruton* v. *United States*, 391 U. S. 123, 135–137 (1968). It is, indeed, "an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Pointer* v. *Texas*, 380 U. S. 400, 405 (1965). Of course, the right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process. *E. g., Mancusi* v. *Stubbs*, 408 U. S. 204 (1972). But its denial or significant diminution calls into question the ultimate " 'integrity of the fact-finding process' " and requires that the competing interest be closely examined. *Berger* v. *California*, 393 U. S. 314, 315 (1969).

In this case, petitioner's request to cross-examine McDonald was denied on the basis of a Mississippi common-law rule that a party may not impeach his own witness. The rule rests on the presumption—without regard to the circumstances of the particular case—that a party who calls a witness "vouches for his credibility."

*Clark* v. *Lansford,* 191 So. 2d 123, 125 (Miss. 1966). Although the historical origins of the "voucher" rule are uncertain, it appears to be a remnant of primitive English trial practice in which "oath-takers" or "compurgators" were called to stand behind a particular party's position in any controversy. Their assertions were strictly partisan and, quite unlike witnesses in criminal trials today, their role bore little relation to the impartial ascertainment of the facts.[7]

Whatever validity the "voucher" rule may have once enjoyed, and apart from whatever usefulness it retains today in the civil trial process, it bears little present relationship to the realities of the criminal process.[8]  It might have been logical for the early common law to require a party to vouch for the credibility of witnesses he brought before the jury to affirm his veracity.  Having selected them especially for that purpose, the party might reasonably be expected to stand firmly behind their testimony.  But in modern criminal trials, defendants are rarely able to select their witnesses: they must take them where they find them.  Moreover, as applied in this case, the "voucher" rule's [9] impact was doubly harmful to Chambers' efforts to develop his defense.  Not only was he precluded from cross-examining McDonald, but, as the State conceded at oral argument,[10] he was also

---

[7] 3A J. Wigmore, Evidence § 896, pp. 658–660 (J. Chadbourn ed. 1970); C. McCormick, Evidence § 38, pp. 75–78 (2d ed. 1972).

[8] The "voucher" rule has been condemned as archaic, irrational, and potentially destructive of the truth-gathering process.  C. McCormick, *supra,* n. 7; E. Morgan, Basic Problems of Evidence 70–71 (1962); 3A J. Wigmore, *supra,* n. 7, § 898, p. 661.

[9] The "voucher" rule has been rejected altogether by the newly proposed Federal Rules of Evidence, Rule 607, Rules of Evidence for United States Courts and Magistrates (approved Nov. 20, 1972, and transmitted to Congress to become effective July 1, 1973, unless the Congress otherwise determines).

[10] Tr. of Oral Arg. 35–37.

restricted in the scope of his direct examination by the rule's corollary requirement that the party calling the witness is bound by anything he might say. He was, therefore, effectively prevented from exploring the circumstances of McDonald's three prior oral confessions and from challenging the renunciation of the written confession.

In this Court, Mississippi has not sought to defend the rule or explain its underlying rationale. Nor has it contended that its rule should override the accused's right of confrontation. Instead, it argues that there is no incompatability between the rule and Chambers' rights because no right of confrontation exists unless the testifying witness is "adverse" to the accused. The State's brief asserts that the "right of confrontation applies to witnesses *'against'* an accused." [11] Relying on the trial court's determination that McDonald was not "adverse," and on the State Supreme Court's holding that McDonald did not "point the finger at Chambers," [12] the State contends that Chambers' constitutional right was not involved.

The argument that McDonald's testimony was not "adverse" to, or "against," Chambers is not convincing. The State's proof at trial excluded the theory that more than one person participated in the shooting of Liberty. To the extent that McDonald's sworn confession tended to incriminate him, it tended also to exculpate Chambers.[13] And, in the circumstances of this case, McDonald's retraction inculpated Chambers to the same extent that it exculpated McDonald. It can hardly be disputed that McDonald's testimony was in fact seriously adverse to Chambers. The availability of the right

---

[11] Brief for Respondent 9 (emphasis supplied).

[12] 252 So. 2d, at 220.

[13] See *Donnelly* v. *United States,* 228 U. S. 243, 272 (1913).

to confront and to cross-examine those who give damaging testimony against the accused has never been held to depend on whether the witness was initially put on the stand by the accused or by the State. We reject the notion that a right of such substance in the criminal process may be governed by that technicality or by any narrow and unrealistic definition of the word "against." The "voucher" rule, as applied in this case, plainly interfered with Chambers' right to defend against the State's charges.

## B

We need not decide, however, whether this error alone would occasion reversal since Chambers' claimed denial of due process rests on the ultimate impact of that error when viewed in conjunction with the trial court's refusal to permit him to call other witnesses. The trial court refused to allow him to introduce the testimony of Hardin, Turner, and Carter. Each would have testified to the statements purportedly made by McDonald, on three separate occasions shortly after the crime, naming himself as the murderer. The State Supreme Court approved the exclusion of this evidence on the ground that it was hearsay.

The hearsay rule, which has long been recognized and respected by virtually every State, is based on experience and grounded in the notion that untrustworthy evidence should not be presented to the triers of fact. Out-of-court statements are traditionally excluded because they lack the conventional indicia of reliability: they are usually not made under oath or other circumstances that impress the speaker with the solemnity of his statements; the declarant's word is not subject to cross-examination; and he is not available in order that his demeanor and credibility may be assessed by the jury. *California* v. *Green,* 399 U. S. 149, 158 (1970). A number of exceptions have developed over the years to allow admission

of hearsay statements made under circumstances that tend to assure reliability and thereby compensate for the absence of the oath and opportunity for cross-examination. Among the most prevalent of these exceptions is the one applicable to declarations against interest [14]—an exception founded on the assumption that a person is unlikely to fabricate a statement against his own interest at the time it is made. Mississippi recognizes this exception but applies it only to declarations against pecuniary interest.[15] It recognizes no such exception for declarations, like McDonald's in this case, that are against the penal interest of the declarant. *Brown* v. *State,* 99 Miss. 719, 55 So. 961 (1911).

This materialistic limitation on the declaration-against-interest hearsay exception appears to be accepted by most States in their criminal trial processes,[16] although a number of States have discarded it.[17] Declarations against penal interest have also been excluded in federal courts under the authority of *Donnelly* v. *United States,* 228 U. S. 243, 272–273 (1913), although exclusion would not be required under the newly proposed Federal Rules of Evidence.[18] Exclusion, where the limitation prevails, is usually premised on the view that admission would lead to the frequent presentation of perjured testimony to the jury. It is believed that confessions of

---

[14] Jefferson, Declarations Against Interest: An Exception to the Hearsay Rule, 58 Harv. L. Rev. 1 (1944).

[15] H. McElroy, Mississippi Evidence § 46 (1955); *Forrest County Coop. Assn.* v. *McCaffrey,* 253 Miss. 486, 493, 176 So. 2d 287, 289–290 (1965).

[16] C. McCormick, *supra,* n. 7, § 278, p. 673; 5 J. Wigmore, Evidence § 1476, pp. 283–287 n. 9 (1940).

[17] See, *e. g., People* v. *Spriggs,* 60 Cal. 2d 868, 389 P. 2d 377 (1964); *People* v. *Lettrich,* 413 Ill. 172, 108 N. E. 2d 488 (1952); *People* v. *Brown,* 26 N. Y. 2d 88, 257 N. E. 2d 16 (1970); *Hines* v. *Commonwealth,* 136 Va. 728, 117 S. E. 843 (1923).

[18] Rule 804, *supra,* n. 9.

criminal activity are often motivated by extraneous considerations and, therefore, are not as inherently reliable as statements against pecuniary or proprietary interest. While that rationale has been the subject of considerable scholarly criticism,[19] we need not decide in this case whether, under other circumstances, it might serve some valid state purpose by excluding untrustworthy testimony.

The hearsay statements involved in this case were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability. First, each of McDonald's confessions was made spontaneously to a close acquaintance shortly after the murder had occurred. Second, each one was corroborated by some other evidence in the case— McDonald's sworn confession, the testimony of an eyewitness to the shooting, the testimony that McDonald was seen with a gun immediately after the shooting, and proof of his prior ownership of a .22-caliber revolver and subsequent purchase of a new weapon. The sheer number of independent confessions provided additional corroboration for each. Third, whatever may be the parameters of the penal-interest rationale,[20] each

---

[19] See, e. g., Committee on Rules of Practice & Procedure, Rules of Evidence for United States Courts and Magistrates 129–131 (rev. draft, Mar. 1971); 5 J. Wigmore, supra, n. 16, § 1476, p. 284; Wright, Uniform Rules and Hearsay, 26 U. Cin. L. Rev. 575 (1957); United States v. Annunziato, 293 F. 2d 373, 378 (CA2), cert. denied, 368 U. S. 919 (1961) (Friendly, J.); Scolari v. United States, 406 F. 2d 563, 564 (CA9), cert. denied, 395 U. S. 981 (1969).

[20] The Mississippi case which refused to adopt a hearsay exception for declarations against penal interest concerned an out-of-court declarant who purportedly stated that he had committed the murder with which his brother had been charged. The Mississippi Supreme Court believed that the declarant might have been motivated by a desire to free his brother rather than by any compulsion of guilt. The Court also noted that the declarant had fled, was unavailable for cross-examination, and might well have known at

confession here was in a very real sense self-incriminatory and unquestionably against interest. See *United States* v. *Harris,* 403 U. S. 573, 584 (1971); *Dutton* v. *Evans,* 400 U. S., at .89. McDonald stood to benefit nothing by disclosing his role in the shooting to any of his three friends and he must have been aware of the possibility that disclosure would lead to criminal prosecution. Indeed, after telling Turner of his involvement, he subsequently urged Turner not to "mess him up." Finally, if there was any question about the truthfulness of the extrajudicial statements, McDonald was present in the courtroom and was under oath. He could have been cross-examined by the State, and his demeanor and responses weighed by the jury. See *California* v. *Green,* 399 U. S. 149 (1970). The availability of McDonald significantly distinguishes this case from the prior Mississippi precedent, *Brown* v. *State, supra,* and from the *Donnelly*-type situation, since in both cases the declarant was unavailable at the time of trial.[21]

---

the time he made the statement that he would not suffer for it. *Brown* v. *State,* 99 Miss. 719, 55 So. 961 (1911). There is, in the present case, no such basis for doubting McDonald's statements. See Note, 43 Miss. L. J. 122, 127–129 (1972).

[21] McDonald's presence also deprives the State's argument for retention of the penal-interest rule of much of its force. In claiming that "[t]o change the rule would work a travesty on justice," the State posited the following hypothetical:

"If the rule were changed, A could be charged with the crime; B could tell C and D that he committed the crime; *B could go into hiding* and at A's trial C and D would testify as to B's admission of guilt; A could be acquitted and B would return to stand trial; B could then provide several witnesses to testify as to his whereabouts at the time of the crime. The testimony of those witnesses along with A's statement that he really committed the crime could result in B's acquittal. A would be barred from further prosecution because of the protection against double jeopardy. No one could

Few rights are more fundamental than that of an accused to present witnesses in his own defense. *E. g., Webb* v. *Texas,* 409 U. S. 95 (1972); *Washington* v. *Texas,* 388 U. S. 14, 19 (1967); *In re Oliver,* 333 U. S. 257 (1948). In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence. Although perhaps no rule of evidence has been more respected or more frequently applied in jury trials than that applicable to the exclusion of hearsay, exceptions tailored to allow the introduction of evidence which in fact is likely to be trustworthy have long existed. The testimony rejected by the trial court here bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest. That testimony also was critical to Chambers' defense. In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice.

We conclude that the exclusion of this critical evidence, coupled with the State's refusal to permit Chambers to cross-examine McDonald, denied him a trial in accord with traditional and fundamental standards of due process. In reaching this judgment, we establish no new principles of constitutional law. Nor does our holding signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and

---

be convicted of perjury as A did not testify at his first trial, B did not lie under oath, and C and D were truthful in their testimony." Brief for Respondent 7 n. 3 (emphasis supplied).

Obviously, B's absence at trial is critical to the success of the justice-subverting ploy.

procedures. Rather, we hold quite simply that under the facts and circumstances of this case the rulings of the trial court deprived Chambers of a fair trial.

The judgment is reversed and the case is remanded to the Supreme Court of Mississippi for further proceedings not inconsistent with this opinion.

*It is so ordered.*

MR. JUSTICE WHITE, concurring.

We would not ordinarily expect an appellate court in the state or federal system to remain silent on a constitutional issue requiring decision in the case before it. Normally, a court's silence on an important question would simply indicate that it was unnecessary to decide the issue because it was not properly before the court or for some other reason. As my Brother REHNQUIST points out, the Court stated in *Street* v. *New York,* 394 U. S. 576, 582 (1969), that "when . . . the highest state court has failed to pass upon a federal question, it will be assumed that the omission was due to want of proper presentation in the state courts, unless the aggrieved party in this Court can affirmatively show the contrary."

Under this rule it becomes the petitioner's burden to demonstrate that under the applicable state law his claim was properly before the state court and was therefore necessarily rejected, although silently, by affirmance of the judgment. If he fails to do so, we need not entertain and decide the federal question that he presses.

It is not our invariable practice, however, that we will not ourselves canvass state law to determine whether the federal question, presented to but not discussed by the state supreme court, was properly raised in accordance with state procedures. The Court surveyed state law in *Street,* itself, with little if any help from the appellant; and I think it is appropriate here where the State does not contest our jurisdiction and seemingly

concedes that the question was properly raised below and necessarily decided by the Mississippi Supreme Court.

There is little doubt that Mississippi ordinarily enforces a rule of contemporaneous objection with respect to evidence; the three opinions in *Henry* v. *State,* 253 Miss. 263, 154 So. 2d 289 (1963); 253 Miss. 283, 174 So. 2d 348 (1965); 198 So. 2d 213 (1967), make this sufficiently clear. Also, that case came here, and we not only noted the existence of the rule but recognized that it served a legitimate state interest. *Henry* v. *Mississippi,* 379 U. S. 443 (1965). The same rule obtains where the proponent of evidence claims error in its exclusion:

> "The rejection of evidence not apparently admissible is not error, in the absence of an offer or sufficient statement of the purpose of its introduction, by which the court may determine its relevancy or admissibility. . . . This Court has consistently followed this rule requiring definiteness and sufficiency of an offer of proof. . . ." *Freeman* v. *State,* 204 So. 2d 842, 847–848 (1967) (dissenting opinion).

There are Mississippi cases stating that in proper circumstances the contemporaneous-objection rule will not be enforced and that the State Supreme Court in some circumstances will consider an issue raised there for the first time. In *Carter* v. *State,* 198 Miss. 523, 21 So. 2d 404 (1945), the only issue in the appellate court concerned appellant's mental condition at the time of the crime, an issue not raised at trial. The court said "[t]he rule that questions not raised in the trial court cannot be raised for the first time on appeal, is not without exceptions, among which are errors 'affecting fundamental rights of the parties . . . or affecting

public policy,' . . . if to act on which will work no injustice to any party to the appeal." *Id.*, at 528, 21 So. 2d, at 404. The court proceeded to consider the issue. In *Brooks* v. *State,* 209 Miss. 150, 155, 46 So. 2d 94, 97 (1950), a convicted defendant asserted in the State Supreme Court for the first time the inadmissibility of certain evidence on the grounds of an illegal search and seizure, violation of the rule against self-incrimination, and improper cross-examination. The court considered these questions and reversed the conviction, saying that "[e]rrors affecting fundamental rights are exceptions to the rule that questions not raised in the trial court cannot be raised for the first time on appeal. . . . [W]here fundamental and constitutional rights are ignored, due process does not exist, and a fair trial in contemplation of law cannot be had."

The reach of these cases was left in doubt when, in affirming the judgment in *Henry* v. *State,* 253 Miss. 263, 154 So. 2d 289 (1963), the Mississippi Supreme Court refused to consider a claim of illegally obtained evidence because the matter had not been presented to the trial court. The case did not come within *Brooks* v. *State, supra,* the court ruled, because Henry's counsel were experienced and adequate, and Henry was bound by their mistakes. This Court vacated that judgment and remanded for determination whether there had been a deliberate bypass, reading Mississippi law as extending no discretion to give relief from the contemporaneous-objection rule where "petitioner was represented by competent local counsel familiar with local procedure." *Henry* v. *Mississippi,* 379 U. S., at 449 n. 5. In its initial opinion on remand, the Supreme Court of Mississippi reasserted the necessity to object at the time testimony is offered in the trial court, but it said "[n]evertheless if it appears to the trial judge that the

foregoing rule of procedure would defeat justice and bring about results not justified or intended by substantive law, the rule may be relaxed and subordinated to the primary purpose of the law to enforce constitutional rights in the interest of justice." *Henry* v. *State,* 253 Miss., at 287, 174 So. 2d, at 351.*

In *King* v. *State,* 230 So. 2d 209, 211 (1970), this statement from the 1965 *Henry* opinion was interpreted as giving the Supreme Court of the State, as well as the trial court, sufficient latitude to treat the request for a peremptory instruction to the jury after failure to object to the introduction of allegedly illegally obtained evidence as if the appellant had made timely objection.

Moreover, in *Wood* v. *State,* 257 So. 2d 193, 200 (1972), where a convicted defendant complained of a wide-ranging and allegedly unfair cross-examination of defense witnesses, and where there had been a failure to object to part of the prejudicial inquiry, the State Supreme Court nevertheless considered the question, stating: "We note also that no objection was made to the testimony of Donald Ray Boyd when he was asked whether he had ever been in jail. However, it was stated in *Brooks, supra,* that in extreme cases a failure to object to questions which were violative of a constitutional right did not in all events have to be objected to before they would receive consideration by this Court. The appellant in this case was being tried for murder. The evidence of defendant's guilt was extremely close. A shred of evidence one way or the other could have been persuasive to the jury. In our opinion, this warrants our

---

*The trial court on remand from the 1965 *Henry* decision, 253 Miss. 283, 174 So. 2d 348, found there had been deliberate bypass, and, affirming on appeal, 198 So. 2d 213 (1967), the Mississippi Supreme Court did not mention *Brooks* v. *State,* 209 Miss. 150, 46 So. 2d 94 (1950), or the rule for like cases.

consideration of the questions and responses to which repeated objections were made and sustained by the court, as well as 'the consideration of the testimony of Donald Ray Boyd wherein he was asked whether he had been in jail or not though no formal objection was made thereto."

These cases seemingly preserve some aspects of the *Brooks* rule, and hence anticipate some situations where the contemporaneous-objection requirement will not be enforced, despite *Henry*. There will be occasions where the Supreme Court of Mississippi will consider constitutional claims made in that court for the first time.

Where this leaves the matter of our jurisdiction in the light of decisions such as *Williams* v. *Georgia,* 349 U. S. 375 (1955), is not clear. There, while acknowledging that motions for a new trial after final judgment were not favored in Georgia, the Court recognized that such motions had been granted in "exceptional" or "extraordinary" cases, their availability being within the well-informed discretion of the courts. It was claimed that denying Williams' motion was an adequate state ground precluding review here, but "since his motion was based upon a constitutional objection, and one the validity of which has in principle been sustained here, the discretionary decision to deny the motion does not deprive this Court of jurisdiction to find that the substantive issue is properly before us." *Id.,* at 389.

In the circumstances before us, where there were repeated offers of evidence and objections to its exclusion, although not on constitutional grounds, where the matter was presented in federal due process terms to the State Supreme Court and where the State does not now deny that the issue was properly before the state court and could have been considered by it, I am inclined, although

*dubitante,* to conclude with the Court that we have jurisdiction.

As to the merits, I would join in the Court's opinion and judgment.

MR. JUSTICE REHNQUIST, dissenting.

Were I to reach the merits in this case, I would have considerable difficulty in subscribing to the Court's further constitutionalization of the intricacies of the common law of evidence. I do not reach the merits, since I conclude that petitioner failed to properly raise in the Mississippi courts the constitutional issue that he seeks to have this Court decide.

Title 28 U. S. C. § 1257 provides in pertinent part as follows:

> "Final judgments or decrees rendered by the highest court of a State in which a decision could be had, may be reviewed by the Supreme Court as follows:
>
> .        .        .        .        .
>
> "(3) By writ of certiorari, . . . where any title, right, privilege or immunity is specially set up or claimed under the Constitution, treaties or statutes of, or commission held or authority exercised under, the United States."

We deal here with a limitation imposed by Congress upon this Court's authority to review judgments of state courts. It is a jurisdictional limitation, *Cardinale* v. *Louisiana,* 394 U. S. 437, 438 (1969), that has always been interpreted with careful regard for the delicate nature of the authority conferred upon this Court to review the judgments of state courts of last resort:

> "Upon like grounds the jurisdiction of this court to reëxamine the final judgment of a state court

cannot arise from mere inference, but only from averments so distinct and positive as to place it beyond question that the party bringing a case here from such court intended to assert a Federal right." *Oxley Stave Co.* v. *Butler County,* 166 U. S. 648, 655 (1897).

In *Street* v. *New York,* 394 U. S. 576 (1969), cited by the Court in its n. 3, the following language from the earlier case of *New York ex rel. Bryant* v. *Zimmerman,* 278 U. S. 63, 67 (1928), was quoted:

> "No particular form of words or phrases is essential, but only that the claim of invalidity and the ground therefor be brought to the attention of the state court with fair precision *and in due time.*" 394 U. S., at 584 (emphasis added).

The question of whether a constitutional issue has been raised in "due time" in the state courts is one generally left to state procedure, subject to the important condition that the state procedure give no indication "that there was an attempt on the part of the state court to evade the decision of Federal questions, duly set up, by unwarranted resort to alleged rules under local practice." *Louisville & Nashville R. Co.* v. *Woodford,* 234 U. S. 46, 51 (1914). More recently, the Court has stated in *Henry* v. *Mississippi,* 379 U. S. 443, 447 (1965) that:

> "These cases settle the proposition that a litigant's procedural defaults in state proceedings do not prevent vindication of his federal rights unless the State's insistence on compliance with its procedural rule serves a legitimate state interest."

Since the Court in *Henry* was dealing with a rule of trial procedure from the State of Mississippi, its analysis in that case is particularly helpful in deciding this one. It was conceded by all parties there that the Mississippi

rules required contemporaneous objection to evidentiary rulings, and this Court commented:

"The Mississippi rule . . . clearly does serve a legitimate state interest. By immediately apprising the trial judge of the objection, counsel gives the court the opportunity to conduct the trial without using the tainted evidence. If the objection is well taken the fruits of the illegal search may be excluded from jury consideration, and a reversal and new trial avoided." *Id.*, at 448.

In that case, the petitioner had made his motion to exclude the evidence at the close of the State's case, and this Court observed that a ruling on the motion at that point would very likely have prevented the possibility of reversal and new trial just as surely as a ruling on a motion made contemporaneously with the offer of the evidence.

Here, however, the record of the state proceedings shows that the first occasion on which petitioner's counsel even hinted that his previous evidentiary objection had a constitutional basis was at the time he filed a motion for new trial. By delaying his constitutional contention until after the evidence was in and the jury had retired and returned a verdict of guilty against him, petitioner denied the trial court an opportunity to reconsider its evidentiary ruling in the light of the constitutional objection. While this Court in *Henry* expressed doubt as to the adequacy for federal purposes of Mississippi's differing treatment of a motion to exclude at the close of the State's case and an objection made contemporaneously with the offer of the evidence, there can be no doubt that the policy supporting Mississippi's requirement of contemporaneous objection cannot be served equally well by a motion for new trial following the rendition of the jury's verdict.

It is perfectly true, as the Court states in n. 3 of its opinion, that petitioner "objected during trial to each of the court's rulings." But this is only half the test; the litigant seeking to have a decision here on a constitutional claim must not only object or otherwise advise the lower court of his claim that a ruling is error, but he must make it clear that his claim of error is *constitutionally* grounded. In *Bailey* v. *Anderson,* 326 U. S. 203 (1945), the petitioner argued in this Court that a state court condemnation award that failed to include interest from the date of possession denied him just compensation in violation of the Due Process Clause of the Fourteenth Amendment. This Court noted that in the state circuit court petitioner had requested that the award include interest from the date of taking, and that the circuit court without explanation had rejected this claim. But this Court went on to say:

> "But throughout the proceedings in the circuit court appellant made no claim to interest on constitutional grounds, and made no attack on the constitutionality of the award or the court's decree because of the asserted denial of interest." *Id.,* at 206.

Concluding from an examination of the opinion of the Supreme Court of Appeals of Virginia that although appellant had raised his constitutional claim there, it had not been passed upon by that court, this Court held that the "appeal must be dismissed for want of any properly presented substantial federal question." *Id.,* at 207.

Neither the majority nor the dissenting opinions of the Supreme Court of Mississippi contain one syllable that refers expressly or by implication to any claim based on the Constitution of the United States. Those opinions did, of course, treat the evidentiary objections and proffers

that this Court now holds to be of constitutional dimension, but it passed on them in terms of nonconstitutional evidentiary questions that are one of the staples of the business of appellate courts that regularly review claims of error in the conduct of trial. Since Mississippi requires contemporaneous objection to evidentiary rulings during the trial, it would have been entirely proper for the Supreme Court of Mississippi to conclude that even though petitioner might have asserted constitutional claims in his brief there, they had been raised too late to require consideration by it.

This Court said in *Street* v. *New York:*

> "Moreover, this Court has stated that when, as here, the highest state court has failed to pass upon a federal question, it will be assumed that the omission was due to want of proper presentation in the state courts, unless the aggrieved party in this Court can affirmatively show the contrary." 394 U. S., at 582.

If, by some extraordinarily lenient construction of the decisional requirement that the constitutional claim be made "in due time" in the state proceedings, the making of such a claim for the first time in a motion for a new trial were deemed timely, it is still extraordinarily doubtful that this petitioner adequately raised any constitutional claims in his motion for new trial. That motion consisted of the following pertinent points:

> "3rd, the Court erred in refusing to declare Gable McDonald a hostile and adverse witness and permitting the Defendant to propound leading questions as on cross-examination.
>
> "4th, the Court erred in refusing to permit the Defendant to introduce evidence corroborating the

admission of Gable McDonald admitting the killing of Aaron Liberty.

.         .         .         .         .

"6th, the trial of the Defendant was not in accord with fundamental fairness guaranteed by the Fourteenth Amendment of the Constitution of the United States and Article Three, Sections Fourteen and Twenty-Six of the Constitution of the State of Mississippi."

It would have to be an extraordinarily perceptive trial judge who could glean from this motion that the separately stated third and fourth points, dealing as they do in customary terms of claims of trial error in the exclusion or admission of evidence, were intended to be bolstered by the generalized assertion of the violation of due process contained in a separately stated point. The contention of the sixth point, standing by itself, that "the trial of the Defendant was not in accord with fundamental fairness guaranteed by the Fourteenth Amendment of the Constitution of the United States" directs the trial court to no particular ruling or decision that he may have made during the trial; it is a bald assertion that the trial from beginning to end was somehow fundamentally unfair. Even the most lenient construction of that part of 28 U. S. C. § 1257 that requires that the "title, right, privilege or immunity" be "specially set up or claimed" could not aid petitioner in his claim that this point properly raised a federal constitutional issue.

This Court under the Constitution has the extraordinarily delicate but equally necessary authority to review judgments of state courts of last resort on issues that turn on construction of the United States Constitution or federal law. But before we undertake to tell a

state court of last resort that its judgment is inconsistent with the mandate of the Constitution, it behooves us to make certain that in doing so we adhere to the congressional mandate that limits our jurisdiction. Believing as I do that petitioner has not complied with 28 U. S. C. § 1257 (3), I would dismiss the writ of certiorari.