STATE of Wisconsin, Plaintiff-Appellant,

v.

Allerd SHARLOW, Defendant-Respondent.†

Court of Appeals

*No. 81–207–CR. Submitted on briefs November 13, 1981.—*
*Decided February 8, 1982.*
(Also reported in 317 N.W.2d 150.)

† Petition to review granted. CALLOW, J., took no part.

For the plaintiff-appellant the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, and *David J. Becker,* assistant attorney general.

For the defendant-respondent the cause was submitted on the brief of *Ben Kempinen* of *Legal Assistance To Institutionalized Persons Program* of Madison.

Before Voss, P.J., Brown and Scott, JJ.

VOSS, P.J.   At issue in this case is whether the trial court mistakenly denied Allerd Sharlow's constitutional right to present a defense. Under the Wisconsin Rules of Evidence which existed in 1973, the trial court refused to admit the hearsay statements of two witnesses. These witnesses would have testified that Thomas Blanchette, a co-defendant tried and convicted of being a party to the murder of Edwin Frahm, admitted shooting Frahm. On this basis, pursuant to a motion under sec. 974.06, Stats., Sharlow was granted a new trial. Although the statements should have been admitted, the trial court committed harmless error in refusing to admit the statements. For this reason, we reverse the order granting Sharlow a new trial.

On the night of May 1, 1972, Blanchette, Frahm and Jerry Kruschke met Sharlow at the Driftwood Tavern. While they were at the Driftwood, Kruschke left the Driftwood three times trying to get a gun belonging to Blanchette. After he returned from the third trip, he gave the gun to Blanchette. After Kruschke gave Blanchette the gun, Randolph Lydolph overheard a conversation between Sharlow and Blanchette in which each expressed a desire to "get" someone. Earlier in the evening, Blanchette told Kruschke that he planned to kill Frahm. At approximately 1:50 a.m., the four men left the tavern in Sharlow's car. Kruschke drove, and Frahm also sat in the front seat. Sharlow sat behind Frahm, and Blanchette sat behind Kruschke. Kruschke testified that he heard a shot. After hearing Sharlow ask Blanchette if he should shoot Kruschke also, Kruschke looked in the rearview mirror and noticed that Sharlow was holding the gun. Blanchette told Sharlow not to shoot Kruschke, but he told him to shoot Frahm again. Frahm was shot in the head five more times. The trajectory of

the bullets indicated that they most likely came from where Blanchette had been sitting.

The state charged Sharlow under secs. 940.01 and 939.05, Stats., as a party to first-degree murder. At trial, Sharlow sought to introduce hearsay testimony of Sharon Henne and James McNeal.[1] Sharon Henne would have testified that Blanchette had told her he alone had shot Frahm. McNeal would have testified that while he shared a cell with Blanchette, Blanchette also admitted to him that he alone had shot Frahm. The court refused to admit the testimony because it was hearsay.

The jury found Sharlow guilty of being a party to first-degree murder, and the trial court entered a judgment of conviction on September 19, 1972. The trial court had held at the time of Sharlow's trial that declarations against penal interest were not to be admitted as exceptions to the hearsay rule. Sharlow appealed the trial court's ruling on the hearsay issue. In *State v. Sharlow*, 61 Wis. 2d 388, 212 N.W.2d 591 (1973), the Wisconsin Supreme Court affirmed the judgment, holding that the statements of Henne and McNeal had been properly excluded under the then-existing Wisconsin law on evidence. The supreme court decided this case on December 10, 1973. That appeal was based upon and decided solely upon evidentiary grounds. The supreme court did note that although the Wisconsin Code of Evidence had been adopted at the time of the appeal and would permit such evidence, if corroborated, the code would apply only to actions pending as of January 1, 1974.

On September 6, 1979, Sharlow brought a motion for post-conviction relief pursuant to sec. 974.06, Stats., contending that he had been denied the constitutional right to call witnesses in his own defense. He based his argu-

---

[1] The record indicates that Henne was not available to testify at trial although Sharlow's attorney was still trying to serve her with a subpoena. McNeal was available.

ment on the United States Supreme Court case of *Chambers v. Mississippi,* 410 U.S. 284 (1973), which was decided on February 21, 1973. The United States Supreme Court decided *Chambers* after the trial court entered judgment against Sharlow but before the Wisconsin Supreme Court reached a decision on Sharlow's appeal.

The motion was assigned to the Honorable Patrick L. Snyder. Judge Snyder ruled that Sharlow had been denied his constitutional right to present a defense and ordered a new trial. The state appeals from that order.

## EFFECT OF THE PREVIOUS WISCONSIN SUPREME COURT RULING

The threshold question to be decided is whether the Wisconsin Supreme Court's previous decision in *Sharlow* prevents this reconsideration on constitutional grounds. Both the previous decision in *Sharlow* and the present appeal deal with whether the statements of Henne and McNeal should be admissible.

We are mindful that the motion brought under sec. 974.06, Stats., may not be used to raise issues disposed of by previous appeal. *Peterson v. State,* 54 Wis. 2d 370, 381, 195 N.W.2d 837, 845 (1972). However, sec. 974.06, Stats., is taken directly from 28 U.S.C. § 2255.[2] In construing 28 U.S.C. § 2255, the United States Supreme Court has held that, "[s]hould doubts arise in particular cases as to whether two grounds are different or the same, they should be resolved in favor of the [petitioner]." *Sanders v. United States,* 373 U.S. 1, 16 (1963). No reason exists for departing from that position.

The previous appeal, *Sharlow,* 61 Wis. 2d at 394–95, 212 N.W.2d at 594–95, indicates that the case was decided

---

[2] *See* Judicial Council Committee comment to sec. 974.06, Stats.

strictly on evidentiary grounds. The motion for post-conviction relief was based on *Chambers,* which recognized a *constitutional basis* for admission of the evidence. This motion, therefore, is brought on an issue different from the issue raised on appeal to the Wisconsin Supreme Court. Although both actions were designed to achieve the same end of admitting the hearsay statements, this alone does not indicate that both actions are based on the same theory. We hold that this is an appeal raised on grounds different from the previous appeal to the supreme court.

## LIMITED RETROACTIVE APPLICATION OF THE *CHAMBERS* DECISION

In *State ex rel. Johnson v. Cady,* 50 Wis. 2d 540, 555, 185 N.W.2d 306, 314 (1971), the Wisconsin Supreme Court adopted the factors from *Stovall v. Denno,* 388 U.S. 293 (1967), to determine whether a procedural requirement will be given retroactive or prospective application. These criteria were: "(1) The purpose to be served by the new standard; (2) the extent of the reliance by law enforcement authorities and by the state on the old standards; and (3) the effect on the administration of justice of a retroactive application of the new standard."

Complete retroactive application[3] is favored if "the major purpose of new constitutional doctrine is to overcome an aspect of the criminal trial that substantially impairs its truth-finding function and so raises serious questions about the accuracy of guilty verdicts in past

---

[3] In *Stovall v. Denno,* retroactive application meant that a decision altering past case law would apply to all cases pending on direct appeal at the time the Court announced a decision changing present law. It would also apply to any cases decided before the decision was announced.

trials . . . ." *Williams v. United States,* 401 U.S. 646, 653 (1971). *Accord, Hankerson v. North Carolina,* 432 U.S. 233, 243 (1977) ; *Gosa v. Mayden,* 413 U.S. 665, 679 (1973).

We observe that in *Linkletter v. Walker,* 381 U.S. 618, 627 (1965), the United States Supreme Court held that changes in law will be given effect to cases which are already pending on direct review. At that time, the Court referred to this type of application as prospective application. *Id.* at 628. The rationale for applying a new rule in such a manner was fashioned in the very early decision, *United States v. Schooner Peggy,* 5 U.S. (1 Cranch) 103, 110 (1801). In speaking for the Court, Chief Justice Marshall held:

It is in the general rule that the province of an appellate court is only to inquire whether a judgment when rendered was erroneous or not. *But if, subsequent to the judgment, and before the decision of the appellate court,* a law intervenes and positively changes the rule which governs, the law must be obeyed, or its obligation denied. [Emphasis added.]

The same approach was used where, as here, a judicial decision altered or overturned case law. *Linkletter,* 381 U.S. at 626.

The definition of prospective application was subsequently changed in *Johnson v. New Jersey,* 384 U.S. 719, *reh. denied,* 385 U.S. 890 (1966). In that case, the Court held that there was no constitutional or jurisprudential obstacle to choosing a different cutoff point to which a decision altering previous case law would apply. *Id.* at 733. The Court was not required to hold that a newly announced decision must apply to those cases now on direct appeal. It could make a decision altering previous case law prospectively applicable only to those trials commenced after the decision was announced. By creating a new, more restrictive definition of prospective ap-

plication, the Court was also creating a new middle category. This category contained those cases which were on direct appeal at the time the change was announced. When a decision is made applicable to those cases, as well as to those cases that come to trial after the change is announced, the decision is now said to have "limited retroactive" applicability.

The Court in *Johnson* supported limiting the application of a case altering previous case law only to those trials commenced after the decision was announced with two justifications. The justifications for this decision became the first two criteria adopted in *Stovall*. First, it held that if police authorities had justifiably relied on old law, they had not intentionally denied the accused's rights. Second, the Court considered the potential burden which would be placed on the judicial system. If the number of cases pending on appeal were so great that making the change applicable to those cases on appeal would burden the administration of justice, the Court would not make changes in law applicable to them. *Id.* at 732–33.

In *Johnson,* the Court suggested that either reliance by law enforcement officers or a burden on the administration of justice or both must be found before a court can prevent making the change applicable to cases pending on appeal when the decision is announced.

In this case, it cannot be said that the State relied heavily upon prior law in formulating its case against Sharlow. This was merely an objection made at trial to the introduction of evidence. It is impossible to know the number of cases which will be affected by the alteration announced in *Chambers*. However, if the *Chambers* decision were given limited retroactive application, only those defendants who had appealed at the time the decision was announced would be given the opportunity to ask post-conviction relief based on that decision's hold-

ing. It is difficult to believe that this would affect more than a small number of cases.

The *Chambers* decision deals with the truth-finding function of trials. This, combined with the fact that the state has not relied upon the old law and our belief that the administration of justice will not be burdened, convinces us that the *Chambers* decision must be given limited retroactive application in Wisconsin. On this point, we agree with the order of the trial court, and the hearsay testimony should have been admitted.[4]

## HARMLESS ERROR

The state contends that even if the *Chambers* decision is given limited retroactive application, the error the trial court made in refusing to admit the two hearsay statements was harmless. A review of the record proves the merit of their argument.

The *Chambers* decision makes it clear that interference with the defendant's right to present a defense, as in this case, is constitutional error. Even errors of constitutional dimension are subject to the harmless error doctrine. *State v. Zellmer*, 100 Wis. 2d 136, 150, 301 N.W.2d 209, 216 (1981). A finding of harmless error

---

[4] We are aware that hearsay statements against the declarant's penal interest will only be admitted if the declarant is unavailable and that hearsay statement is corroborated. Here, Blanchette refused to testify at Sharlow's trial by asserting his fifth amendment privilege. The statements Blanchette allegedly made to Henne and McNeal were corroborated by the testimony of Dr. Helen Young, an expert witness of the state. She testified that the shots which killed Frahm entered from the back right of his head and exited from the front left. The inference can be made, therefore, that the shots were likely fired from where Blanchette was sitting.

requires the state to prove beyond a reasonable doubt that the error did not contribute to the verdict obtained. *Id.*

The state charged Sharlow, and the court convicted him, as a party to the crime of first-degree murder. Under sec. 939.05(2), Stats., a person may be a party to a crime if he directly commits the crime, aids or abets in the commission of it, or is a party to a conspiracy with another to commit it. If the evidence offered establishes any of these possibilities beyond a reasonable doubt, the person charged under secs. 939.05 a1 ⸱ 940.01, Stats., is guilty of being a party to first-degree murder. Admission of evidence which may create a doubt that Sharlow did the actual shooting does not alone establish that he did not aid the person who did the shooting or was not a party to the crime.

The evidence in this case proves beyond a reasonable doubt that Sharlow was a party to the crime of first-degree murder. Three facts establish this. First, Lydolph overheard Sharlow tell Blanchette that he would "get him" for Blanchette. This conversation occurred shortly after Blanchette had told Kruschke he planned to kill Frahm. It also occurred after Blanchette had sent Kruschke to get Blanchette's gun. Twice Kruschke returned without the gun. Blanchette told Kruschke to look again, and this time, he returned with the gun. These facts occurring as they did establish that the "him" referred to was Frahm, and what Sharlow meant by "getting him" was killing Frahm.

Second, when Sharlow, Blanchette, Kruschke and Frahm left the Driftwood Tavern, they took Sharlow's car.[5] Blanchette had his car parked outside the Driftwood, but the four men rode in Sharlow's car. Sharlow did not drive. Instead, he sat in the back seat behind

---

[5] Although it was never proved that Sharlow had legal title to the car, he admitted that this was his car.

Frahm. The use of Sharlow's car and the fact that Sharlow did not drive, but sat in a position where he could commit or aid in the murder, contributes to our holding.

Third, after the murder had been committed, Sharlow helped Blanchette dispose of Frahm's body. All of these facts, taken together, establish Sharlow's desire to participate and his participation in Frahm's murder. For this reason, the order of the trial court mandating a new trial is reversed.

*By the Court.*—Order reversed.