691 A.2d 417

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
JEFFREY BUNYAN, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted March 4, 1997—Decided April 15, 1997.

468

Before Judges PRESSLER, STERN and WECKER.

*Susan L. Reisner,* Public Defender, attorney for appellant (*Kevin B. Dowling,* Designated Counsel, of counsel and on the brief).

*Clifford J. Minor,* Essex County Prosecutor, attorney for respondent (*Raymond W. Hoffman,* Assistant Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

PRESSLER, P.J.A.D.

Defendant Jeffrey Bunyan appeals from the denial of his petition for certification and his motion for a new trial. We reverse. We are satisfied that defendant was entitled to a hearing to determine the admissibility of the material "new evidence" on which he based his motion, and we remand for that purpose.

On February 7, 1982, a patron of the C & B Tavern in Newark shot and killed one of the tavern owners, Melvin Mann, and then made good his escape without being apprehended. The shooting was observed by the victim's brother, Erwin Mann, the other owner, who had never seen the shooter before that night. There were other witnesses as well including two patrons, a barmaid and a bartender. None of them knew the shooter or had seen him before. All five were shown photo arrays and line-ups, and three of them assisted in the preparation of a composite sketch, all to no avail. The only photo identification made was of someone other than defendant. These witnesses all noted the shooter's exceptional height, estimating it as between six feet three inches and six feet six inches, and estimating his weight at about 240 pounds. Of signal importance is the fact that the shooter was with a woman in the tavern at the time of the shooting. The woman, identified as Jo Ann Brown, was interviewed by the investigating police two days after the shooting. She told them that the shooter had picked her up that evening and brought her to the tavern in his car. She had not previously known him. She thought his name was Michael, and he told her he was from Jersey City, had been in the army, had served in Vietnam, and killed people for a living. She also gave a physical description of the shooter as looking "like he was about 7 feet tall," and weighing about 240 pounds.[1]

For the next year and a half, the police investigation was unsuccessful, and the shooter remained unidentified. Then, on September 12, 1983, defendant went to the C & B Tavern. While there, he became involved in some kind of confrontation at the bar with the sister of the Mann brothers, whom he assaulted with a razor blade. He himself was shot. After he fled the tavern, several people there who had also been eyewitnesses to the murder of Melvin Mann claimed to have recognized defendant as the shooter of a year and a half earlier. The police were called and were led to defendant by a child who knew him. All five of

---

[1] According to the presentence report, defendant is six feet one inch tall, weighs 200 pounds, and was never in the army.

the eyewitnesses to the murder made out-of-court identifications of defendant not only as the assaulter with the razor blade but also as Melvin Mann's killer.

Defendant was charged with multiple offenses arising both out of the February 7, 1982, shooting and the September 12, 1983, razor-blade assault. Following a nine-day trial on all charges in January 1984, defendant was convicted of the two charges relating to the 1983 event, namely third-degree possession of a razor blade with an unlawful purpose and fourth-degree aggravated assault as a lesser-included offense of the second-degree aggravated assault with which he had been charged. The jury was unable, however, to reach a unanimous decision with respect to the murder and related weapons-possession charges arising out of the February 1982 killing. A mistrial was consequently declared.

Defendant was retried on the murder charge in February 1984.[2] The State's evidence consisted of the eyewitness testimony of the victim's brother, the two tavern employees, and the two patrons who saw the murder. Jo Ann Brown was not produced either by the prosecution or by the defense, both of whom claimed to have been unable to locate her despite their efforts to do so. Defendant, despite his criminal record, testified in his own behalf, denying that he had been in the tavern on February 7, 1982, and denying that he had shot Melvin Mann or anyone else. The jury, after being at first unable to agree and consequently instructed to continue its deliberations, finally found defendant guilty. He was sentenced to a life term subject to twenty-five years of parole ineligibility. By our opinion filed on February 18, 1986, under Docket Number A–3776–83T4, we affirmed the judgment of conviction on direct appeal, and the Supreme Court denied defendant's petition for certification. *State v. Bunyan,* 104 *N.J.* 412, 517 *A.*2d 412 (1986). No issue was raised on appeal respecting Jo

---

[2] The State had successfully moved for severance of the murder charge from the related weapons-possession charges and later moved to dismiss the weapons charges after defendant was found guilty of the murder.

Ann Brown's absence from trial, and it does not appear that defense counsel sought court aid to procure her presence.

The proceedings now before us are not the first post-conviction proceedings brought. Insofar as we are able to reconstruct the record, defendant filed a *pro se* petition for post-conviction relief shortly after the Supreme Court denied his petition for certification. The post-conviction relief petition was summarily denied and, on appeal to this court in 1988, after what appears to have been an inordinate delay in the filing of the notice of appeal and its perfection, we reversed, directing that a hearing be held and that defendant be accorded representation by the Public Defender. *State v. Bunyan*, Docket Number A–1770–86T4. At the ensuing hearing, defense counsel raised issues relating to the unreliability of the eye-witness identification. Since these issues were or could have been raised on direct appeal, *R.* 3:22–4, relief was denied by the trial court. That order was appealed and, eventually, in February 1994, we affirmed under Docket Number A–4432–89T4.

The matter before us now was commenced by defendant's *pro se* motion for a new trial in June 1992. As we understand what happened, defendant continued his efforts, following his conviction, to prove his innocence of the murder and, with the aid of a "third party," hired Herbert Bell, a private investigator licensed by the State of New Jersey, to attempt to find Jo Ann Brown. According to Bell's affidavit dated April 11, 1990, he succeeded in locating her at her place of employment in Union, New Jersey, in January 1990. Using the original 1982 police reports, he was able to verify her identity as the woman who was the shooter's companion on the night of the tavern murder. Among other indicia of identity, she gave Bell her social security number and the names and address of her parents as noted in those reports. Bell then showed her a photograph of defendant taken in March 1984 while he was incarcerated. She told Bell that she did not know that person, that he was not the man who had committed the tavern murder, and that she knew no one named Jeffrey Bunyan. Brown con-

firmed that she had never been contacted by the police after the initial interviews and had never been requested or subpoenaed to testify at Bunyan's trial.

Bell attempted either to obtain a written statement from Brown attesting to this information or her undertaking to give such a statement to either the prosecutor or the public defender. She refused to do so and refused to give Bell her address and telephone number, assuring him, however, that she would telephone him that evening. She did so, telling him she had decided not to get involved, that she had turned her life around since the shooting and that if he, Bell, persisted in drawing her into the matter, she would lie about her knowledge that Bunyan was not the shooter. At that point, according to Bell, a man identified only as Robert, took the phone from Brown, said he was her boyfriend, and physically threatened Bell in the event that Bell continued to involve Brown in the investigation.

The record does not indicate any further communication between Bell and either Brown or her boyfriend or, indeed, whether Bell ever ascertained the identity of the boyfriend. Defendant, in his *pro se* new-trial motion papers, asserts that after Bell had found and interviewed Brown, he advised defendant that he needed more money to carry on with the investigation. Since defendant was unable to provide him with additional funds, Bell concluded his investigation by providing defendant with his April 1990 affidavit in the tenor we have described. The record also does not indicate why it took two years after Bell had located and interviewed Brown for the new trial motion to be made. We do, however, note that defendant was unrepresented during this time, was probably unsure as to how to proceed, and, according to his assertion, was also attempting to follow up on other "leads" suggested by Bell.

In any event, following the new trial motion, the Public Defender's office was assigned to represent defendant. That process apparently took considerable time, and there were several adjournments of the original date for the hearing of the new trial

motion. It was eventually scheduled for December 3, 1993. By that time, although the record is vague as to how that fact was learned and who learned it, Brown had died. All defendant was accordingly left with was Bell's hearsay respecting the Brown interview two years earlier, to which, as we understand the record, he was willing to testify. The trial judge concluded that since there was no hearsay exception pursuant to which Bell's testimony would be admissible in evidence, there was, in effect, no competent new evidence. He also opined that the evidence, even if admissible, would not warrant a new trial. Hence he denied the motion. It is that denial that is the subject of this appeal.

We note at the outset that the standard for granting a new trial based on newly discovered evidence is well settled. The trial judge must be satisfied that the proffered new evidence is material, could not have been reasonably discovered before trial, and has the capacity to have changed the jury's verdict had it been available at trial. *State v. Carter,* 85 *N.J.* 300, 314, 426 *A.*2d 501 (1981); *State v. Robinson,* 253 *N.J.Super.* 346, 365–367, 601 *A.*2d 1162 (App.Div.), *certif. denied,* 130 *N.J.* 6, 611 *A.*2d 646 (1992); *State v. Engel,* 249 *N.J.Super.* 336, 402, 592 *A.*2d 572 (App.Div.), *certif. denied,* 130 *N.J.* 393, 614 *A.*2d 616 (1991); *State v. Coburn,* 221 *N.J.Super.* 586, 600, 535 *A.*2d 531 (App.Div.1987), *certif. denied,* 110 *N.J.* 300, 540 *A.*2d 1281 (1988). It is analytically helpful to consider first whether, had Jo Ann Brown lived, her testimony in accord with the substance of Bell's affidavit, would have constituted new evidence of a character requiring a new trial. We have no doubt that it would have so qualified.

First, the test of materiality is obviously met. Brown was the person in the tavern that evening who had the longest and best opportunity to observe the shooter. She had been with him before they entered the tavern. They had conversed at some length both before and after they had arrived at the tavern. Since the only real issue at trial was that of identification, it is patent that Brown's testimony that defendant was not the shooter was not only material, but was critical. It is also clear, in view of the

police and defense representations that Brown could not be located prior to trial, that the evidence was not then discoverable.[3] Finally, we have no doubt that Brown's testimony was likely to have changed the result.

We consider the following circumstances. The eyewitnesses who testified against Bunyan were all related to or were employees or customers of the victim whose identification of Bunyan came only after defendant assaulted the victim's sister. Brown, who had the longest and best opportunity to observe and converse with the shooter, was the only known eyewitness who had absolutely no interest in the shooter being identified. The physical descriptions given by all the eyewitnesses immediately after the shooting described a significantly taller and heavier person than defendant. The eyewitness identifications were made a year and a half after the shooting. The first jury that tried defendant could not unanimously agree. The second jury required a "continued-deliberation" charge in order to reach unanimity. Moreover, the State's eyewitnesses at the second trial gave more positive testimony then than they had at the first trial. In sum, the State's case rested exclusively on eyewitness identification testimony whose foundation can hardly be characterized as rock solid. Brown's exculpatory testimony was likely to have made a critical difference in the outcome.

The question before us is simply whether defendant has lost the opportunity to have a jury consider Brown's exculpation because she died. Our rules of evidence, of course, address the admissibility of declarations by deceased persons. *N.J.R.E.* 804 (Hearsay Exceptions: Declarant Unavailable) provides for two situations in which such hearsay may be admitted. Thus Rule 804(b)(2) allows admission in a criminal proceeding of a statement made by a deceased victim, of the crime while believing in the imminence of

---

[3] We note in passing that it might be productive to know how Bell found Brown in light of the police assertion that they could not.

his own death if made voluntarily and in good faith. Rule 804(b)(6) allows admission in a civil proceeding of

> a statement made by a person unavailable as a witness because of death if the statement was made in good faith upon the declarant's personal knowledge in circumstances indicating that it is trustworthy.

We appreciate that by the ordinary application of these rules, Brown's statement is not admissible. It is not admissible under Rule 804(b)(2) because not made by a victim of the crime believing in the imminence of her death. It is not admissible under Rule 804(b)(6) because this was not a civil but a criminal proceeding.[4] We do not, however, believe that that ends the inquiry.

The United States Supreme Court in *Chambers v. Mississippi*, 410 *U.S.* 284, 302, 93 *S.Ct.* 1038, 1049, 35 *L. Ed.*2d 297, 312–313 (1973), has made clear that there are situations in which a defendant's Sixth Amendment right to present evidence in his defense must take precedence, as a matter of due process of law, over the mechanistic application of a state's hearsay rules. Thus, as Justice Powell explained:

> Few rights are more fundamental than that of an accused to present witnesses in his own defense. *E.g., Webb v. Texas*, 409 *U.S.* 95, 93 *S.Ct.* 351, 34 *L. Ed.*2d 330 (1972); *Washington v. Texas*, 388 *U.S.* 14, 19, 87 *S.Ct.* 1920, 1923, 18 *L. Ed.*2d 1019 (1967); *In re Oliver*, 333 *U.S.* 257, 68 *S.Ct.* 499, 92 *L. Ed.* 682 (1948). In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence. Although perhaps no rule of evidence has been more respected or more frequently applied in jury trials than that applicable to the exclusion of hearsay, exceptions tailored to allow the introduction of evidence which in fact is likely to be trustworthy have long existed. The testimony rejected by the trial court here bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest. That testimony also was critical to Chambers' defense. In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice.

The New Jersey Supreme Court has restated the *Chambers* principle as setting "forth a limited doctrine whereby certain

---

[4] Nor is there an apparent Rule 803 exception available here such as excited utterance, 803(c)(2), or statement against interest, 803(c)(25).

exclusions of evidence proffered by a criminal defendant are found to have so prevented a fair trial as to be unconstitutional, notwithstanding that they are based on generally valid state rules of evidence." *State v. Cavallo*, 88 *N.J.* 508, 526, 443 *A.2d* 1020 (1982). *See also State v. Jamison*, 64 *N.J.* 363, 378, 316 *A.2d* 439 (1974).

We do not here advocate either an expansive interpretation of *Chambers* or a wholesale retreat from the limitations imposed by our hearsay rules. We are, however, persuaded that under the extraordinary circumstances before us, the vindication of defendant's right to a fair trial and the interests of justice require that he be afforded an opportunity to demonstrate the reliability of the evidence on which he now relies and to adduce it at a new trial if it is found reliable.

*Chambers*, of course, stipulates that the constitutional mandate can override state hearsay rules only if the hearsay declaration can be deemed trustworthy. We note that this is the very condition of admissibility prescribed by *N.J.R.E.* 804(b)(6), which excepts from the exclusion of the hearsay rule in civil proceedings, decedents' statements "made in good faith upon declarant's personal knowledge in circumstances indicating that it is trustworthy." That is to say, we are not dealing here with an entirely new hearsay exception or with hearsay evidence that is, as a categorical matter, unequivocally inadmissible. We are, rather, dealing with a category of hearsay that is institutionally recognized as admissible provided the explicitly stated conditions for admissibility are met by way of a preliminary determination pursuant to Rule 104(a). It is, of course, true that this category of hearsay, even if meeting the conditions of admissibility, is limited to civil proceedings. But we understand this limitation as designed to protect the constitutional rights of criminal defendants and particularly the right to confrontation, which is obviously compromised by the admission of a decedent's statement. The issue here does not, however, involve protection of a criminal defendant's right *vis-a-vis* inculpatory evidence adduced by the State on which he

cannot conduct cross-examination. Rather, it involves a criminal defendant's right to present reliable, albeit hearsay, exculpatory evidence—evidence, moreover, of a category that is available to every civil litigant. We further note that admissibility in favor of a criminal defendant of evidence inadmissible against him is not a novel dichotomy and is, indeed, supported by the rationale of *Chambers*. *See also, e.g.*, Rule 803(c)(25) (statements against interest). Where that evidence can be the difference between a guilty verdict and an acquittal, we are convinced that *Chambers* mandates a fair consideration of its admissibility.

We do not here hold that Bell's testimony respecting Brown's statement is necessarily admissible at a trial. It must first meet the reliability criteria of Rule 804(b)(6)—made in good faith on personal knowledge and in circumstances indicating trustworthiness. Whether it does or not is the first order of business, and we remand to the trial court for an evidential hearing pursuant to Rule 104 for that determination. If the evidence is found to meet the conditions of admissibility, a new trial shall be ordered. If not, the judgment of conviction shall stand.

We make this additional observation. There is a surprising dearth of authority, both federal and state, dealing with the *Chambers* issue in a situation such as this. It appears, however, that that is probably attributable to the fact that the Federal Rules of Evidence contain a "residual" hearsay exception, *Fed. R.Evid.* 804(b)(5), which permits the admission of the statement of an unavailable declarant in any case in which that statement meets the criteria of circumstantial trustworthiness formulated by the rule. Although New Jersey did not adopt that rule, *see* 1991 Supreme Court Committee Comment on Rule 804(b), reprinted in Biunno, *Current N.J. Rules of Evidence* (Gann), other states did. It thus appears that admission of trustworthy exculpatory statements by unavailable declarants are customarily admitted under that rule, rendering a *Chambers* analysis superfluous. *See, e.g., State v. Toney*, 243 *Neb.* 237, 498 *N.W.*2d 544 (1993) (admitting under the residual rule the testimony of a television news program

producer to whom an eyewitness had reported that defendant was not the perpetrator); *Parker v. State*, 606 *So.*2d 1132 (Miss.1992) (admitting under the residual rule the statement of a deceased witness to a lifelong friend exculpating defendant).

Finally, defendant also claims that he was denied effective assistance of counsel with respect to his new trial motion. We regard that issue as moot, however, in view of our disposition.

We reverse and remand for further proceedings consistent with this opinion.