712 A.2d 1091

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v.
JEFFREY BUNYAN, DEFENDANT–RESPONDENT.

Argued January 22, 1998—Decided June 4, 1998.

262

*Barbara A. Rosenkrans,* Assistant Prosecutor, argued the cause for appellant (*Clifford J. Minor,* Essex County Prosecutor, attorney; *Ms. Rosenkrans* and *Raymond W. Hoffman,* of counsel and on the briefs).

*James K. Smith, Jr.,* Assistant Deputy Public Defender, argued the cause for respondent (*Ivelisse Torres,* Public Defender, attorney; *Mr. Smith* and *Kevin B. Dowling,* Designated Counsel, on the briefs).

*Robert E. Bonpietro,* Deputy Attorney General, argued the cause of *amicus curiae,* Attorney General of New Jersey (*Peter Verniero,* Attorney General, attorney).

The opinion of the Court was delivered by

O'HERN, J.

This appeal concerns the right of a prisoner serving a sentence for murder to offer the newly discovered, exculpatory, hearsay

statement of a deceased witness to the killing as grounds for a new trial. Because the witness had threatened to recant her statement before her death and because her statement is cumulative of other evidence of innocence, we find that the trial court correctly denied defendant's motion for a new trial.

I

This case concerns two related barroom incidents. On February 7, 1982, a patron of the C & B Tavern in Newark shot and killed one of the tavern's owners, Melvin Mann, and then escaped. Several people, including the victim's brother, two customers, and two employees of the tavern, witnessed the murder. During the police investigation, witnesses viewed photo arrays, a line-up, and three witnesses contributed to the preparation of a composite sketch. Despite these efforts, the police were not able to apprehend the shooter.

Jo Ann Brown had accompanied the shooter into the C & B Tavern on the night of the killing. Police interviewed Brown two days after the murder. Brown said that she had not known the shooter prior to Mann's murder. Brown stated that the shooter, whose name she thought was Michael, approached her on the street just minutes before the murder. According to Brown's statement, the shooter forced her to accompany him inside the tavern. Brown said the shooter looked "like he was about seven feet tall." Defendant is approximately six feet tall.

A year and a half later, on September 12, 1983, defendant Jeffrey Bunyan, was in the C & B Tavern. During an argument with Sylvia Mann, defendant assaulted her with a razor blade. Police apprehended defendant, and five witnesses identified him both as the man who assaulted Sylvia Mann in September 1983 and as the shooter who murdered Melvin Mann over eighteen months earlier.

Defendant was tried for both crimes. In January 1984, a jury convicted him of possession of a weapon for an unlawful purpose

and aggravated assault in connection with the 1983 attack on Sylvia Mann. The jury was unable to reach a unanimous verdict on the 1982 murder charge, and the court declared a mistrial. The State retried defendant.

During the second murder trial, the State relied on the testimony of the victim's brother, three customers, and two tavern employees who witnessed the murder. The testimony of these witnesses was different in several respects from the testimony the same witnesses gave in the first trial. Their descriptions of the shooter were more elaborate and their identifications of defendant more confident. Conflicting descriptions given in the first trial were not repeated. Neither the State nor the defense called Jo Ann Brown during either trial because she could not be located.

Defendant did call three witnesses to challenge aspects of the testimony of the State's identification witnesses. All of the defense testimony rebutted specific facts testified to by the State's witnesses in an effort to show that defendant was not the individual who killed Melvin Mann. Defendant testified that he was not in the C & B Tavern on the night of the murder.

The jury convicted defendant of the murder of Melvin Mann. The court sentenced him to a life term with a twenty-five-year period of parole ineligibility.

Following an unsuccessful appeal, defendant hired a private investigator, Herbert Bell, to find Jo Ann Brown. Bell located Brown in January 1990. After verifying Brown's identity, Bell showed Brown a photograph of defendant that had been taken in March 1984. According to Bell, Brown could not identify the man in the photograph and stated that the man in the photograph was not the individual who committed the 1982 murder. Brown also said that she did not know anyone named Jeffrey Bunyan. Bell was unsuccessful in persuading Jo Ann Brown to give him a written statement memorializing what she had disclosed to him. According to Bell, Brown contacted him on the evening following their meeting. Brown informed Bell that she did not want to get

involved and threatened to implicate defendant as the killer, despite her statement to the contrary, should Bell persist in attempting to contact her. Bell's further efforts to contact Brown were unsuccessful.

Bunyan waited more than two years before filing a motion for a new trial based on Bell's affidavit. By this time, Brown had died. The trial court denied Bunyan's motion, in December 1993, because the portion of Bell's affidavit relating to Brown's statement did not fall within any exception to the hearsay rule. The Appellate Division reversed the trial court's denial of defendant's motion and remanded the matter for an evidentiary hearing to determine the reliability of Brown's statement contained in Bell's affidavit. The Appellate Division reasoned that a reliable statement might be admissible through an analogy to *N.J.R.E.* 804(b)(6), which permits civil litigants to introduce statements of a deceased declarant. *State v. Bunyan*, 299 *N.J.Super.* 467, 475, 691 *A.2d* 417 (1997). In addition, the Appellate Division reasoned that the statement might be admissible under the Sixth Amendment of the United States Constitution, which guarantees a criminal defendant the right to present evidence of innocence. *Id.* at 475–76, 691 *A.2d* 417 (citing *Chambers v. Mississippi*, 410 *U.S.* 284, 302, 93 *S.Ct.* 1038, 1049, 35 *L. Ed.2d* 297, 312–13 (1973)). The panel concluded that, in this case, principles of fairness required that the statement be admitted if found reliable.

> We are ... persuaded that under the extraordinary circumstances before us, the vindication of defendant's right to a fair trial and the interests of justice require that [defendant] be afforded an opportunity to demonstrate the reliability of the evidence on which he now relies and to adduce it at a new trial if it is found reliable.

> [*Id.* at 476, 691 *A.2d* 417.]

We granted the State's petition for certification. 151 *N.J.* 74, 697 *A.2d* 546 (1997).

## II

### A.

This case represents a manifestation of what has been described as the "constitutionalization" of the law of evidence. *E.g.,* Edward

J. Imwinkelried, *The Constitutionalization of Hearsay: The Extent to Which the Fifth and Sixth Amendments Permit or Require the Liberalization of the Hearsay Rules*, 76 *Minn. L.Rev.* 521 (1992). Traditionally, rules of evidence were the sole province of state law. That viewpoint was recently affirmed by the United States Supreme Court in *Montana v. Egelhoff*, 518 *U.S.* 37, 43, 116 *S.Ct.* 2013, 2017, 135 *L. Ed.*2d 361, 368 (1996).

In some instances, however, rules of evidence may not conform with constitutional requirements. Constitutional protections have been held in some circumstances to override the literal application of state hearsay rules. The Confrontation Clause in particular has protected criminal defendants against the admission of inculpatory hearsay statements that would otherwise have been admissible under exceptions to state hearsay rules. *E.g., Idaho v. Wright*, 497 *U.S.* 805, 814, 110 *S.Ct.* 3139, 3146, 111 *L. Ed.*2d 638, 651 (1990); *Bruton v. United States*, 391 *U.S.* 123, 125, 88 *S.Ct.* 1620, 1622, 20 *L. Ed.*2d 476, 479 (1968); *Barber v. Page*, 390 *U.S.* 719, 724–25, 88 *S.Ct.* 1318, 1322, 20 *L. Ed.*2d 255, 260 (1968); *Pointer v. Texas*, 380 *U.S.* 400, 407, 85 *S.Ct.* 1065, 1070, 13 *L. Ed.*2d 923, 928 (1965). Other constitutional provisions, such as the Compulsory Process Clause of the Sixth Amendment, may require admission of evidence even though the evidence would be inadmissible according to state rules of evidence. *See Chambers, supra,* 410 *U.S.* at 302, 93 *S.Ct.* at 1049, 35 *L. Ed.*2d at 312–13.

## B.

States have an interest "in ensuring that reliable evidence is presented to the trier of fact in a criminal trial." *United States v. Scheffer,* —— *U.S.* ——, ——, 118 *S.Ct.* 1261, 1265, 140 *L. Ed.*2d 413, 419 (1998). State hearsay rules exclude out-of-court statements because the opposing party will not be able to test the reliability of those statements at trial. 2 *McCormick on Evidence* § 245 (Strong ed., 4th ed.1992). In order to prevent the exclusion of hearsay evidence bearing "strong indicia of reliability," a num-

ber of exceptions to the general rule of exclusion have developed. *State v. Phelps,* 96 *N.J.* 500, 508, 476 *A.*2d 1199 (1984).

Not all efforts to introduce the out-of-court statements of witnesses will fit neatly within one hearsay exception or another. The drafters of the *Federal Rules of Evidence* proposed that "equivalent circumstantial guarantees of trustworthiness" should justify the admission of otherwise inadmissible hearsay evidence under what are known as "residual hearsay exceptions." *See Fed.R.Evid.* 803(24) (in instances when declarant is available to testify at trial), and 804(b)(5) (in instances when declarant is unavailable to testify at trial). The most recent version of the *Federal Rules of Evidence* consolidated the residual hearsay exceptions of Rules 803(24) and 804(b)(5) in Rule 807. The Senate Judiciary Committee stated that "[i]t is intended that the residual hearsay exceptions will be used very rarely, and only in exceptional circumstances" and that the "committee does not intend to establish a broad license for trial judges to admit hearsay statements that do not fall within one of the other exceptions contained in rules 803 and 804(b)." *Committee on the Judiciary, S.Rep. No. 93–1277, Note to Paragraph (24), Fed.R.Evid.* 803(24), 28 *U.S.C.A.* (1984).

■ Courts do not assume the reliability of a statement when employing one of the residual hearsay exceptions. When considering the admissibility of a hearsay statement that does not fall within one of the recognized hearsay exceptions, the statement must, as a threshold consideration, be supported by " 'a showing of particularized guarantees of trustworthiness.' " *Wright, supra,* 497 *U.S.* at 816, 110 *S.Ct.* at 3147, 111 *L. Ed.*2d at 653 (quoting *Ohio v. Roberts,* 448 *U.S.* 56, 66, 100 *S.Ct.* 2531, 2539, 65 *L. Ed.*2d 597, 608 (1980)); *see Fed.R.Evid.* 807. Once that showing is made, the new federal residual hearsay rule requires that the court determine

that (A) the statement is offered as a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purpose of

these rules and the interests of justice will be best served by admission of the statement into evidence.

[*Fed.R.Evid.* 807.]

New Jersey has declined to adopt a residual hearsay exception. The latest report of this Court's Committee on the Rules of Evidence again rejects the adoption of a residual hearsay exception. *Supreme Court Committee Report on the Rules of Evidence, January 15, 1998,* 151 *N.J.L.J.* 729, 731 (Feb. 16, 1998). In its 1991 Report, the Committee had described the residual hearsay exception as a "radical departure from New Jersey practice." *Biunno, Current N.J. Rules of Evidence,* 1991 Supreme Court Committee Comment on *N.J.R.E.* 803(c)(24) [not adopted] (1997–98).

## III

### A.

The Appellate Division held that Brown's statement should be subject to a hearing under *N.J.R.E.* 104, to determine its reliability, as a predicate to determining its admissibility. *Bunyan, supra,* 299 *N.J.Super.* at 477, 691 *A.*2d 417; *see N.J.R.E.* 104(a) ("When ... the admissibility of evidence ... is subject to a condition, and the fulfillment of the condition is in issue, that issue is to be determined by the judge.... The judge may hear and determine such matters out of the ... presence of the jury."). The Appellate Division contemplated that the trial court would make a determination of admissibility based on the following reliability criteria contained in *N.J.R.E.* 804(b)(6): the statement was made in good faith, on personal knowledge, and in circumstances indicating reliability. The panel recognized that *N.J.R.E.* 804(b)(6) was designed for use in the civil context, not criminal. Because the trial court's decision affected defendant's constitutional right to present exculpatory evidence, however, the Appellate Division reasoned that the *Chambers* rationale supported the use of *N.J.R.E.* 804(b)(6) in a criminal context when addressing defen-

dant's request to introduce exculpatory evidence. *Bunyan, supra,* 299 *N.J.Super.* at 476–77, 691 *A.*2d 417.

Because the language of 804(b)(6) limits its applicability to civil proceedings, the State argues that the Appellate Division created a new rule of evidence without proper consideration of the procedures established by the 1960 Evidence Act. The State argues that although some "judicial modification" of the evidence rules is permissible, *Jacober by Jacober v. St. Peter's Med. Ctr.,* 128 *N.J.* 475, 493–94, 608 *A.*2d 304 (1992), the "modification" required in this instance would amount to the creation of a new hearsay exception.

We disagree that the Appellate Division has created a new rule of evidence. The panel was instead reacting to the fundamental lack of fairness that occurs when an accused is deprived of the opportunity of having a court consider whether the witness' statement was reliable. The Appellate Division's central concern was with the due-process interests of the defendant as set forth in *Chambers.* We disagree, however, with the panel's conclusion that the "extraordinary circumstances" of this case require exercise of an exception to the hearsay rule.

## B.

Defendant asserts that a criminal defendant's right, under the Sixth Amendment, to present evidence in his defense must sometimes trump the "mechanistic application of a state's hearsay rules." *Bunyan, supra,* 299 *N.J.Super.* at 475, 691 *A.*2d 417 (citing *Chambers, supra,* 410 *U.S.* at 302, 93 *S.Ct.* at 1049, 35 *L. Ed.*2d at 312–13). However, the scope of *Chambers* is not unlimited. The *Chambers* Court declared:

> In reaching this judgment, we establish no new principles of constitutional law. Nor does our holding signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures. Rather, we hold quite simply that under the facts and circumstances of this case the rulings of the trial court deprived Chambers of a fair trial.

*[Chambers, supra,* 410 *U.S.* at 302–03, 93 *S.Ct.* at 1049, 35 *L. Ed.*2d at 313.]

Because the holding of *Chambers* is so intimately related to the "facts and circumstances" of that case, *Scheffer, supra,* —— *U.S.* at ——, 118 *S.Ct.* at 1268, 140 *L.Ed.*2d at 423, we must consider the facts of *Chambers* and compare them to the facts of this case. Leon Chambers called a witness, Gable McDonald, who had previously confessed to the murder with which Chambers was charged. During cross-examination, the State elicited testimony indicating that McDonald had repudiated his confession. Chambers sought to impeach McDonald on redirect or, in the alternative, offer three witnesses who would testify that McDonald had admitted the killing to them. Because of Mississippi's "voucher rule," Chambers was not permitted to impeach the witness whom he had called. Nor was he permitted to call the three witnesses to impeach McDonald's testimony due to Mississippi's hearsay rule.

The Supreme Court found that the combination of the two Mississippi rules that prevented the defendant from introducing exculpatory evidence denied Chambers a fair trial. The Court held that it was a denial of due process to exclude hearsay statements that "bore persuasive assurances of trustworthiness" and were "critical to Chambers' defense." *Chambers, supra,* 410 *U.S.* at 302, 93 *S.Ct.* at 1049, 35 *L. Ed.*2d at 313. Each statement "was made spontaneously to a close acquaintance shortly after the murder had occurred," "was corroborated by some other evidence in the case," and "was in a very real sense self-incriminatory and unquestionably against interest." *Id.* at 299–302, 93 *S.Ct.* at 1048–49, 35 *L. Ed.*2d at 311–13.

Given the changing stories of the witnesses, we agree with the Appellate Division that a court must be concerned that a possibly innocent man is serving a life sentence for murder. Were there stronger circumstances of reliability surrounding Brown's out-of-court statement, we might well agree with the Appellate Division that strict application of the hearsay doctrine would not be warranted. *Chambers* stated that "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense ... [and] where constitutional rights directly affecting the ascer-

tainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Id.* at 302, 93 *S.Ct.* at 1049, 35 *L. Ed.*2d at 312–13.

In contrast with the statements in *Chambers,* Jo Ann Brown's statement does not have the same measure of reliability. There is no "particularized guarantee[ ] of [its] trustworthiness." *Wright, supra,* 497 *U.S.* at 816, 110 *S.Ct.* at 3147, 111 *L. Ed.*2d at 653. Her statement was not against her interests. She made it years after the crime occurred. After making her statement to a private investigator, Brown immediately threatened to disavow it. Additionally, unlike the declarant in *Chambers,* who was available for trial, there will be no opportunity to cross-examine Brown, who is now deceased. And Brown's statement, unlike the admissions of Gable McDonald, was not spontaneous. On the contrary, she gave it in response to questions posed by a private investigator defendant hired. (Concededly, that investigator has been candid to disclose the unfavorable aspects of the statement as well as the exculpatory.) Still, other circumstances of reliability might better have supported defendant's position. If, for example, her statement had been given to the investigating police prior to trial and Brown had herself died prior to trial, the argument in favor of admissibility would be much more compelling. Taken as a whole, however, Brown's statement does not share the same level of trustworthiness as McDonald's declarations against interest in *Chambers.*

■ The touchstone of the *Chambers* analysis is fundamental fairness. *Lipinski v. New York,* 557 *F.*2d 289, 292 (2d Cir.1977), *cert. denied,* 434 *U.S.* 1074, 98 *S.Ct.* 1262, 55 *L. Ed.*2d 779 (1978). Defendant does not have an unlimited right to present relevant evidence. That right is subject to restrictions. *See Chambers, supra,* 410 *U.S.* at 295, 93 *S.Ct.* at 1045–46, 35 *L. Ed.*2d at 308–09. Defendant cannot argue that he did not receive a fundamentally fair trial. In a broader sense, that is all *Chambers* requires.

■ In sum, the clear "indicia of reliability" envisioned by *Chambers* to support a constitutionally required hearsay exception

are not found in the circumstances from which Jo Ann Brown's statement emerged. The exclusion of Brown's statement has not "so prevented a fair trial as to be unconstitutional." *State v. Cavallo*, 88 *N.J.* 508, 526, 443 *A.*2d 1020 (1982).

Accordingly, we reverse the judgment of the Appellate Division and reinstate the judgment of the trial court.

*For reversal and reinstatement*—Chief Justice PORITZ, and Justices HÁNDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.