**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3152-18T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

MATTHEW G. MOORE,
a/k/a MATT,

    Defendant-Appellant.

_____

Argued telephonically May 7, 2020 –
Decided July 23, 2020

Before Judges Alvarez and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Salem County, Indictment No. 16-11-0521.

Leonard S. Baker argued the cause for appellant (Greenblatt Pierce Funt & Flores, LLC, attorneys; Leonard S. Baker, of counsel and on the brief).

Lila Bagwell Leonard, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Lila Bagwell Leonard, of counsel and on the brief).

PER CURIAM

Defendant appeals from an April 22, 2019 judgment of conviction for second-degree vehicular homicide, N.J.S.A. 2C:11-5(a), and driving while intoxicated, N.J.S.A. 39:4-50, for the death of his nephew, a passenger in a truck he crashed while driving drunk. We affirm.

I.

The following facts are derived from the record. On November 29, 2015, defendant and his nephew spent approximately eight hours drinking at the Alloway Village Bar. According to a witness who joined the two men more than four hours after they arrived, defendant and his nephew consumed five or six beers and one shot of alcohol between 9:00 p.m. and midnight, when defendant told his nephew he was ready to leave. It is undisputed the two left the bar parking lot in defendant's truck. The central disputed issue at trial was whether defendant or his nephew was driving.

Shortly after midnight, State Troopers were called to the scene of a motor vehicle accident on a rural road near the bar. They found defendant's truck "completely destroyed." Defendant's nephew was "[h]anging out of the truck on the passenger side" with one leg "pinned inside and under the dash" of the passenger side of the truck. He died of blunt force trauma to his torso before

2

first responders arrived on scene. Defendant was on the ground beside his deceased nephew being treated by medical personnel. He was transported to a hospital in Delaware for treatment.

An expert in accident reconstruction testified that a computer chip from defendant's truck indicated it was travelling at seventy-nine miles per hour when it left the road, striking a tree five seconds later. He opined that the truck's speed at the time of impact was between seventy-six and eighty-two miles per hour. The brakes had not been applied before the crash. The posted speed limit for the roadway was forty miles per hour.

State Troopers investigating the crash interviewed defendant in his hospital bed. They read him Miranda[1] warnings before he began answering questions. He admitted that he had been at the bar with his nephew prior to the crash but could not recall how much alcohol he had consumed or how long they had been there. Although defendant said he could not recall the accident, he stated that he had not been thrown from the truck and had crawled from the vehicle to assist his nephew.

A Delaware justice of the peace issued a warrant to draw defendant's blood. Test results indicated a blood alcohol content (BAC) at the time of the

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

blood draw of 0.147. The legal limit for driving in New Jersey is 0.08. In an extrapolation report, an expert determined that at the time of the crash defendant's BAC was between 0.17 and 0.23.

The day after the crash, defendant called his nephew's mother from the hospital and told her "he was sorry and that it was all his fault." He said he did not know how the crash happened and that "the last thing he remembered was [his nephew] telling him, [']we're leaving and we're taking your truck and you're driving.[']"

A few days later, a friend visited defendant at the hospital. He told her that he did not "really remember everything, but he said he was driving." He told her "when he woke up he looked over to find [his nephew]. [He] wasn't there so he went to get out of the truck and he fell out of the truck and had to crawl around and he found [his nephew.]" Although the friend told police defendant made these admissions at his nephew's funeral, she testified she was mistaken when she spoke to police.

The victim's mother saw defendant at her son's wake. She testified that defendant said to several people at the wake that he "was sorry, it was his fault and that he was a piece of shit." She visited defendant approximately a week

later, and he again told her "that he was sorry and it was all his fault." After he was indicted, defendant began telling the victim's mother he was not driving.

Prior to trial, defendant moved to suppress the statements he made from his hospital bed. He argued he was too impaired from his injuries and alcohol consumption to have voluntarily and knowingly waived his <u>Miranda</u> rights. After an evidentiary hearing, which included review of an audio recording of the interrogation, Judge Benjamin C. Telsey denied defendant's motion. In an oral opinion, Judge Telsey found "the State has met its burden of proof beyond a reasonable doubt that the statement was voluntarily and knowingly given after voluntarily and knowingly waiving his Miranda rights."[2]

Defendant also moved pretrial pursuant to N.J.R.E. 104 to admit hearsay statements from a deceased witness, Bradley Loveland. Loveland was a bouncer at the Alloway Village Bar on the night of the crash. He died about five months before the hearing on defendant's motion. His wife, Helen Nelson, testified that someone had called Loveland around 1:30 a.m. on the morning of the accident to tell him there had been a crash "and that actually that [defendant] had passed

---

[2]  On the same day, Judge Telsey denied defendant's motion to suppress the results of the blood draw, rejecting his argument the Delaware justice of the peace lacked authority to issue the warrant.

5

away." Nelson had been at the bar the night of the crash and asked Loveland what happened after she left.

She testified that Loveland told her "[defendant] and I think his nephew . . . I don't know his name" had left the bar about an hour after she had. Nelson asked Loveland "if [defendant] was driving or if the nephew was driving," and he said "he did not actually see them leave the parking lot but he did see [the victim] put [defendant] in the passenger side of the vehicle and that [defendant] was very intoxicated."

Seven months after defendant was charged, Loveland gave a statement to a defense investigator that was similar to that recounted in his wife's testimony. The investigator did not record Loveland's statement. He did, however, create a report, which included Loveland's statement and indicated Loveland admitted he consumed four beers on the night in question.

Defendant argued Loveland's out-of-court statements were admissible pursuant to N.J.R.E. 804(b)(6). In a comprehensive oral opinion, Judge Linda L. Lawhun denied defendant's motion. She concluded defendant had not established any of the indicia of reliability that would warrant admission of Loveland's hearsay statements. As the court explained, when referring to Loveland's statement to the investigator,

I really have no measure from the testimony I have received to determine whether the statement was made in good faith or not. I know nothing of Mr. Loveland. He's deceased. I don't know the circumstances under which he gave that statement other than that an investigator went to speak to him so I would have to say at best I can really make no finding as to whether he made the statement in good faith.

I don't know what his relationship was with either [defendant] or [the victim]. There's an indication he knew them both by name from seeing them in the bar. I don't know if that's a good thing or a bad thing for either one of them. . . . On the face of it, without knowing the declarant, it appears [his statement was] made upon his personal knowledge. . . . The statement was made 10 months after the accident, made to a defense investigator. . . . [T]he question is we don't know what exactly Mr. Loveland said or why he said it and the State makes a very good point. He has no way of ever being able to find out why Mr. Loveland gave the statement that he gave to [the investigator]. . . . [W]hat causes the Court the greatest concern is the fact that he didn't come forward at any time before he was approached by the investigator to authorities to correct what he perceived to be an error. . . . [H]e had some knowledge that [defendant] had been charged with this offense and [the victim] was deceased.

The court concluded,

[t]here are no particularized facts from which I can guarantee its trustworthiness and for that reason neither the testimony of [the investigator] or Ms. Nelson will be admissible as to what Mr. Loveland had to say.

A-3152-18T3

At trial, defense counsel argued the State did not prove defendant was driving the truck at the time of the crash. Counsel argued that when the truck struck the tree, defendant was thrown from the passenger seat to outside the truck and his nephew was thrown from the driver's seat to the passenger seat. An accident reconstruction expert testified it would not have been possible "for the driver to be thrown at a 90[-]degree angle on impact into the passenger seat," nor would it have been possible for the passenger to have been thrown 90 degrees out of the vehicle. According to the expert, "it's only going to happen one way. You can't change the laws of physics." He explained that because defendant and his nephew were not wearing seatbelts, when the truck hit the tree, they would have continued in "the pre-impact speed that the vehicle was traveling" until they hit the inside of the truck. He opined, "the vehicle [stopped] by [they did] not." He also testified that "the entirety of the crushing of the vehicle was within two-tenths of a second." Thus, the only way for the victim's foot and lower leg to have been pinned under the passenger-side dashboard was for him to have been in the passenger seat at the moment of the crash.

After a three-day trial, a jury found defendant not guilty of first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1), and guilty of second-degree vehicular homicide, N.J.S.A. 2C:11-5 and driving while intoxicated, N.J.S.A.

8

39:4-50.   Judge Lawhun sentenced defendant to a three-year term of incarceration, with a three-year period of parole ineligibility.

This appeal followed.  Defendant raises the following arguments for our consideration.

> POINT I
>
> THE TRIAL COURT'S REFUSAL TO ALLOW APPELLANT TO OFFER INTO EVIDENCE AN EXCULPATORY STATEMENT FROM A DECEASED WITNESS VIOLATED APPELLANT'S DUE PROCESS RIGHTS AND HIS RIGHT TO PRESENT A DEFENSE.
>
> POINT II
>
> THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS THE RESULTS OF HIS BLOOD ALCOHOL TEST WHERE HIS BLOOD WAS DRAWN PURSUANT TO AN INVALID SEARCH WARRANT ISSUED BY A DELAWARE JUSTICE OF THE PEACE WHO LACKED TERRITORIAL JURISDIC[TI]ON TO ISSUE THE WARRANT.[3]
>
> POINT III
>
> THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS HIS STATEMENT WHERE THE STATE FAILED TO ESTABLISH THE STATEMENT WAS MADE VOLUNTARILY, KNOWINGLY AND

---

[3] At oral argument, defendant withdrew this argument.

INTELLIGENTLY UNDER THE TOTALITY OF THE CIRCUMSTANCES.

POINT IV

THE STATE'S EXPERT WITNESS, DETECTIVE PAUL APPLEGATE, SHOULD NOT HAVE BEEN ALLOWED TO OPINE THAT JOSHUA MOORE WAS THE PASSENGER IN THE VEHICLE.[4]

## II.

"In reviewing a trial court's evidential ruling, an appellate court is limited to examining the decision for abuse of discretion." Hisenaj v. Kuehner, 194 N.J. 6, 12 (2008). N.J.R.E. 804(b)(6) allows admission into evidence "[i]n a civil proceeding, [of] a statement made by a person unavailable as a witness because of death if the statement was made in good faith upon declarant's personal knowledge in circumstances indicating that it is trustworthy." This rule was extended to criminal proceedings so long as there is a "particularized guarantee[] of [the statement's] trustworthiness." State v. Bunyan, 154 N.J. 261, 267 (1998) (quoting Idaho v. Wright, 497 U.S. 805, 816 (1990) (alteration in original)).

Our review of the record reveals no mistaken exercise of discretion by Judge Lawhun when she denied defendant's motion to admit Loveland's hearsay statements. There is ample support in the record for the trial court's conclusion

---

[4] At oral argument, defendant withdrew this argument.

that Loveland's statements do not have sufficient indicia of trustworthiness to warrant admission. Unlike the out-of-court declarant in Chambers v. Mississippi, 410 U.S. 284, 299-302 (1973), on which defendant relies, Loveland made statements that were not self-incriminatory or otherwise against his interest. In addition, unlike the declarant in Chambers, who was available for cross-examination, Loveland, who died before the start of defendant's trial, could not be cross-examined. This factor is particularly relevant because of the notation in the investigator's report that Loveland had consumed a significant amount of alcohol on the night in question. Loveland's alcohol consumption raises questions about the reliability of his perceptions and memory, as well as the accuracy of his estimate of his alcohol intake, given that he admitted to drinking while at work. Finally, as noted by the Court in Bunyan, an out-of-court statement to a defense investigator made long after the events in question is less trustworthy than a statement given to investigating police. 154 N.J. at 271. There is no evidence in the record Loveland recounted his statements to police investigators, although the trial court found he was likely aware defendant had been charged with his nephew's death.

We note, as well, that Loveland admitted he did not see defendant and his nephew leave the tavern's parking lot. Nor did he state that he saw either of

11

them drive the truck. Finally, the record contains significant evidence, including unrebutted expert testimony, establishing that defendant's nephew was in the passenger seat at the time of the crash.

## III.

"An appellate court reviewing a motion to suppress evidence in a criminal case must uphold the factual findings underlying the trial court's decision, provided that those findings are 'supported by sufficient credible evidence in the record.'" State v. Boone, 232 N.J. 417, 425-26 (2017) (quoting State v. Scriven, 226 N.J. 20, 40 (2016)). Findings of fact are overturned "only if they are so clearly mistaken 'that the interests of justice demand intervention and correction.'" State v. Elders, 192 N.J. 224, 244 (2007) (quoting State v. Johnson, 42 N.J. 146, 162 (1964)). However, we owe no deference to conclusions of law made by the trial court, which are reviewed de novo. Boone, 232 N.J. at 426.

A valid waiver of Miranda rights "does not require that an individual be informed of all information useful in making his decision." State v. A.M., 237 N.J. 384, 398 (2019). "Instead, a knowing, intelligent, and voluntary waiver is determined by the totality of the circumstances surrounding the custodial interrogation based on the fact-based assessments of the trial court." Ibid.; see also State v. Presha, 163 N.J. 304, 313 (2000). When making this analysis,

courts consider the defendant's age, education, and intelligence, whether he or she was advised of his constitutional rights, the length of the detention, whether the interrogation was repeated and prolonged, and whether physical punishment or mental exhaustion were involved. State v. Nyhammer, 197 N.J. 383, 402 (2009).

We see no ground for reversing the trial court's decision with respect to the statements defendant made from his hospital bed. Judge Telsey listened to the audiotape of defendant's interrogation twice, the second time with the aid of a written transcript. He determined that defendant was sober, alert, aware of his circumstances, and able to waive his right to remain silent. In evaluating whether defendant was too intoxicated to knowingly and voluntarily waive his rights, Judge Telsey concluded "that's not the case here at all." He continued, "[i]n fact, the transcript indicates that he was responsive with regard to these answers. He was quick with regards to his response, he had no extended delays before he provided responses."

In addition, the judge found the instance where defendant "apologized for cursing to the officer to be indicative of someone that understood what was going on." He noted, "someone [who] is so impaired is not going to be concerned about cursing in front of an officer to the point where he actually

apologizes for acting disrespectful."  The court also noted defendant corrected an investigator's factual error when he stated that he had not been thrown from the truck, which the court found indicative of defendant's awareness of his circumstances.[5]

To the extent we have not addressed defendant's other arguments, it is because we conclude them to be without sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[5]  Because we agree with the trial court's conclusion that defendant knowingly and voluntarily waived his Miranda rights, we need not address the question of whether he was in custody while in his hospital bed.

A-3152-18T3