TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-00-00497-CR






Bobby Garcia, Appellant



v.



The State of Texas, Appellee








FROM THE DISTRICT COURT OF TRAVIS COUNTY, 167TH JUDICIAL DISTRICT,


NO. 0991372, HONORABLE MICHAEL LYNCH, JUDGE PRESIDING







 A jury convicted Bobby Garcia of the aggravated sexual assault of E.G., his niece. (1)
The district court assessed punishment at ten-and-a-half years in prison. We affirm the judgment.


BACKGROUND


 E.G. and appellant told nearly identical versions of the events surrounding the assault. 
They essentially diverge only where E.G. claims the assault occurred and appellant denies it. (2) E.G.
was staying overnight with appellant; no one else was at the house that night. When appellant asked
where E.G. wanted to sleep, she elected to sleep in his bed. Appellant testified that he went to sleep
and next remembers waking up around 7 or 7:30 a.m. to find E.G. watching television; she said she
could not sleep. He poured a bowl of cereal for her and they went on with their day. 

 E.G.'s testimony added details about the offense. She said she chose to sleep in the
bed because it was more comfortable, not knowing appellant was going to sleep there, too. She said
that she thought appellant had fallen asleep, but then he put his hand under her panties. He put his
fingers into her vagina and moved them, producing a "watery" sound. He was breathing a little
harder, "kind of panting"; after about a minute, he stopped. E.G. said he never opened his eyes. She
got up, went to the bathroom, then went to the kitchen for the rest of the night. She thought about
calling her mother, but did not know where to call. E.G. said she felt uncomfortable. She did not
say anything to appellant about it the next morning because she was scared. 

 The parties had similar, additional discrepancies regarding another incident that
occurred about a year later. E.G. was staying with appellant and his girlfriend, Roxana. E.G. was
upset when they did not take her to a children's restaurant and amusement center because it was
about to close for the night. Around 11 p.m., after a minor disagreement with appellant, Roxana
went to bed. Appellant and E.G. kept watching television. E.G. testified that she was sitting on
appellant's leg on a chair and watching "Saturday Night Live" ("SNL"); appellant did not recall
sitting on a chair that night. Appellant awakened Roxana half an hour later, saying that E.G. was
crying and inconsolable. Appellant and Roxana testified that E.G. was upset because she wanted
her mother and they could not reach her. In E.G.'s version, after Roxana left, appellant was asleep
and breathing hard, but kept putting his hand on top of her jeans; she said he got close to between
her legs, but she kept moving his hand away, about two or three times. She said appellant never
opened his eyes. When she got up and sat on the couch, appellant got up and went to bed in his
room. E.G. said appellant appeared tired, but not particularly happy, sad, or mad. Roxana agreed
that appellant was tired, but also said he was frustrated because he could not get E.G. to stop crying. 
Roxana said she had more success calming the child. E.G., however, said she cried a bit after
appellant left, but that no one came to see about her. E.G. said she stayed up all night. Carol, E.G.'s
mother and appellant's sister, testified E.G. was crying when she picked her up the next morning,
but she seemed fine; E.G. said she missed her mother. Carol said appellant and Roxana told her that
E.G. had thrown a fit the night before, demanding to be taken home, but no one knew where to reach
her. Carol said E.G.'s behavior, combined with Roxana and appellant's story, struck her as odd.

 These incidents came to light in September 1999 when E.G. did not want to stay
overnight with appellant. He, Roxana, E.G., Carol, and Barbara (Carol and appellant's mother) were
returning from a funeral in McAllen. After the long drive, they went to Carol's boyfriend's house.
Roxana and appellant offered to watch E.G. if Carol wanted to spend the night at her boyfriend's
house. E.G. got upset, said that she did not want to stay with appellant, and insisted that Carol take
her home. Carol testified that, on the way home, she asked E.G. what was wrong, and E.G. told her
about the "SNL incident." In Carol's version there were some different details. She said that E.G.
told her appellant slammed the door on his way into the bedroom. Carol also said that E.G. told her
that after a while, she went and slept in the bed with appellant and Roxana, but also that she stayed
awake all night crying.

 Carol testified that she was not sure what to do after this report. She said that,
because of the volatile nature of her relationship with her family, she hesitated to report E.G.'s
outcry; she did not think Barbara would believe E.G. Carol sent E.G. to Indianapolis to live with
E.G.'s father, his wife, and their three children. She did so even though E.G. had never met him and
he had beaten Carol when they were together; Carol said she believed that he had not abused his new
family and that E.G. would be better off living with her father in a relatively stable environment.

 After E.G. was with her father, Carol reported the abuse to Child Protective Services
("CPS"). While CPS tried to interview E.G. from Indianapolis, Detective Johnny McMiller, an
Austin policeman, called appellant, who had heard rumors from friends that Carol was accusing him
of the abuse. Appellant went voluntarily to talk with the policeman about the report, saying he
wanted to clear up the controversy. Appellant's responses were much like his testimony--he
admitted sleeping in the same bed as E.G. and having her sit on his lap, but he denied sexually
assaulting her. The chief discrepancy between Detective McMiller's memory and appellant's
recollection is that appellant believed the detective offered him counseling if he would admit guilt,
and McMiller denied making the offer; the audio portion of the videotape of the interview was
unintelligible and therefore unhelpful on this issue. Carol testified that appellant called her offering
to undergo counseling to avoid prosecution; appellant denied calling her or bargaining for
counseling.

 When E.G. returned from Indianapolis after six months, she went to the Travis
County Child Advocacy Center ("the Center") where she was interviewed by Cynthia Cantu, a
forensic investigator. Cantu said E.G. told her that appellant touched the inside of her vagina with
his hand while they were in his bed. Cantu said E.G. was soft-spoken, but open, and that E.G. got
teary-eyed and her voice cracked when describing the incident. E.G. did not have access to her
mother during the interview, and the investigator did not talk to Detective McMiller during the
interview. Miriam Jansky, a therapist at the Center who treated E.G. briefly, said E.G. was tight-lipped, jumpy, and had trouble sleeping. Jansky said E.G. was very angry at appellant for the abuse
and at Carol for creating the environment in which it happened--that is, E.G. was angry that so many
people other than her mother provided child care for her. Jansky also said E.G. was angry that Carol
had so many people over to their house; she wanted more time with her mother.

 Witnesses testified that E.G. and appellant exhibited behaviors consistent with the
allegations. Psychologist William Carter (who did not examine E.G.) testified that the details E.G.
gave about the assault--the sound appellant's fingers made, his heavy breathing--lent credibility
to her outcry. Carter and psychologist Jeff Ezell agreed that a delay before the outcry is not unusual;
young children, particularly those abused by family members they like, hesitate to make an outcry
because they are confused by what happened, fear they will not be believed, and fear getting
someone they like in trouble. Jansky testified that E.G.'s anger, jumpiness, insomnia, and hesitance
to talk about the incident were consistent with the allegations. Appellant's behavior, too, was not
surprising for an abuser. Carter said people who enjoy sex with children also can have normal sexual
relationships with adults. Carter said that pedophiles often "groom" their targets by giving them gifts
and taking them places to gain their trust; E.G. testified that, though she did not get along with
appellant when she was very young, he started being nice to her about a year or two before the first
assault. Detective McMiller said that appellant's acknowledgment of the facts surrounding the
assault was not unusual; he said many people tell the truth right up to the point where they get in
trouble.

 Other witnesses testified that E.G. might be making these allegations to effect Carol's
revenge against her family. Even E.G. described her mother's relationship with appellant as "a
rollercoaster." Many witnesses testified that appellant was free and blunt with his criticism of
Carol's career, lifestyle, and child-rearing methods. Carol testified that she was an exotic dancer and
that, when E.G. was young, she had been a nude masseuse who occasionally performed sexual acts
for money; she denied doing the latter for years. Carol said that her mother also did not agree with
her lifestyle because her mother was more religious whereas Carol was more "open-minded." 
Barbara said appellant called Carol a whore and a prostitute. Barbara said appellant nixed Carol
moving in with Barbara, appellant, and Roxana because Carol lacked personal and monetary
discipline.

 Other testimony also concerned the credibility of E.G. and Carol. Immediately after
denying that she would instruct E.G. to lie about these accusations, Carol herself testified that she
had gotten E.G. to lie about their residence in order to stay at a good school. Though E.G.'s teacher
described her as a truthful child who would even inculpate herself, a family friend described her as
a "mixed-up kid." The same friend said Carol was lying if she testified that E.G. went to the same
Austin school for six years because he remembered picking up E.G. from different schools. Though
Carol insisted that she moved E.G. to Indianapolis for protection, others said she told them that she
was moving E.G. there to provide the stability that she could not. There was also a discrepancy in
perception of an incident on the return trip from the funeral in McAllen; during a midtrip change in
drivers, E.G. said she saw appellant hit Roxana as they walked behind the car, but Roxana said she
hit him lightly because she was upset with the way he was driving her car.

 Witnesses also testified to the genuineness of appellant's concern for E.G. Friends
and relatives said he never showed abnormal interest in the child. They also testified regarding a
party at which he roused Carol from a drunken stupor to insist that E.G. be taken somewhere that
she would not be surrounded by drunken men; witnesses said that appellant seemed more concerned
with E.G.'s welfare than Carol was. They testified that he and Roxana watched after E.G. overnight
many times, sometimes on the spur of the moment, sometimes for many days in a row when Carol
dropped her off and disappeared without telling them where she was going or how long she would
be gone.

 There is no physical evidence substantiating the assault. Dr. Beth Nauert testified
that, under the circumstances, none was expected; the assault described was a digital penetration of
E.G.'s sexual organ that occurred more than a year before E.G. reported it in September 1999. 
E.G.'s physical condition was consistent both with assault and lack of assault.


DISCUSSION


 By his second point of error, appellant contends that the court erred by excluding
evidence that would have allowed him to explain E.G.'s knowledge of sexual matters. Appellant
contends that evidence of Carol's livelihood also would have allowed him to explain his criticisms
of Carol and Carol's animosity toward him. 

 A defendant has a fundamental right to present evidence of a defense as long as the
evidence is relevant and is not excluded by an established evidentiary rule. See Chambers v.
Mississippi, 410 U.S. 284, 302 (1973). A court can exclude relevant evidence if its probative value
is substantially outweighed by the danger of unfair prejudice, misleading the jury, or needless
presentation of cumulative evidence. See Tex. R. Evid. 403. We will review the trial court's
decision to bar the admission of evidence under an abuse of discretion standard. See Weatherred v.
State, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000); Montgomery v. State, 810 S.W.2d 372, 390-91
(Tex. Crim. App. 1990).

 The trial court determined that the evidence adduced outside the jury's presence
regarding Carol's occupations was merely character evidence and irrelevant, and that any probative
value was substantially outweighed by the prejudicial effect. Appellant challenges this exclusion,
not because the evidence bears directly on the elements of the offense charged, but because the
evidence illuminates E.G.'s ability and motivation to fabricate testimony about the offense.

 Before examining the district court's decision, we note initially that the decision is
supported by another evidentiary rule and that the record contains other, less inflammatory evidence
serving the purported function of the excluded evidence. The trial court's decision to exclude the
evidence of the victim's mother's work in sexually oriented businesses is supported by Texas Rule
of Evidence 608(b); evidence regarding a witness's sexual activities or misconduct, absent a criminal
conviction, is not admissible to impeach or to show bad character of the witness. See Tex. R. Evid.
608(b); Ramos v. State, 819 S.W.2d 939, 941-42 (Tex. App.--Corpus Christi 1991, pet. ref'd). We
further note that the record reflects that appellant could and did present his theories through less
prejudicial evidence. The jury heard from several sources, including Carol and E.G., that Carol had
a stormy relationship with appellant. The jury heard that Carol often passed E.G. off to babysitters
in order to spend time with boyfriends, that Carol passed out leaving E.G. in the company of drunken
men, and that appellant called her a whore. The jury also heard that Carol was financially
irresponsible and that she moved around quite a bit. Finally, the jury heard that appellant prevented
her from moving in with their mother.

 Reviewing the merits of the district court's decision, we conclude that the court did
not abuse its discretion by finding the evidence not relevant or probative. The propounded
evidence--that Carol is an exotic dancer who eight years before worked as a nude masseuse and
occasionally performed sexual acts for money--does not show that E.G. was able to lie about the
sexual assault knowledgeably because she had unusual access to sexual knowledge. There is no
evidence that E.G. observed sexual activity as a result of Carol's occupation or otherwise. There is
no evidence that E.G. knew about Carol's previous occupation or her current occupation as an exotic
dancer. The evidence instead is that E.G. had not been in the club where Carol performed. In sum,
the evidence offered did not show a connection between Carol's employment and E.G.'s knowledge
of sexual activity. Though evidence that Carol had animosity toward appellant might illuminate a
motivation for fabrication, evidence that Carol had been a prostitute had no probative value
regarding her or E.G.'s animosity toward appellant. Appellant's criticism of Carol has probative
value, but the justification for that criticism has no bearing on the elements of the offense or E.G.'s
ability or motivation to lie. Indeed, appellant's defensive position seems stronger without the
evidence; jurors would probably impute more rightful animosity to Carol stemming from appellant's
calling her a whore if they did not know that she actually had committed acts of prostitution.

 We also conclude that the district court did not abuse its discretion by finding the
minimal probative value of the evidence substantially outweighed by the risk of confusion of the
issues or unfair prejudice. Evidence that a sexual assault complainant's mother worked in sexually
oriented businesses risks distracting the jury from the elements of the offense; jurors could be
tempted unfairly to impute Carol's actions to her daughter. Further, evidence of sexual misconduct
inherently creates a substantial danger of unfair prejudice. See Montgomery, 810 S.W.2d at 397.

 Because the excluded evidence confuses the issues, is highly prejudicial, has little
probative value, and was cumulative on the issues appellant sought to introduce it, we conclude that
the court did not abuse its discretion by excluding it. We overrule point two.

 By his first point of error, appellant contends that the evidence is factually insufficient
to support the jury's verdict; he concedes that the evidence is legally sufficient. Appellant was
charged with intentionally and knowingly penetrating E.G.'s sexual organ with his finger or,
alternatively intentionally and knowingly, with intent to gratify his sexual desire, touching the
genitals of E.G. (3) When reviewing the factual sufficiency of the evidence, appellate courts consider
all the evidence in a neutral light and reverse only if the verdict is so contrary to the overwhelming
weight of the evidence as to be unjust. See Johnson v. State, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000);
Clewis v. State, 922 S.W.2d 126, 134 (Tex. Crim. App. 1996). We must accord the jury's verdict
due deference and should not, in effect, become the thirteenth juror. See Clewis, 922 S.W.2d at 133. 
We cannot interfere with the jury's resolution of conflicts in the evidence or pass on the weight or
credibility of testimony; unless the record clearly reveals that a different result was appropriate, we
defer to the jury's determination concerning what weight to give contradictory testimonial evidence
because the jurors' resolution of such conflicts often turns on an evaluation of credibility and
demeanor by the jury. See Johnson, 23 S.W.3d at 8.

 Factually sufficient evidence supports the judgment. E.G. plainly testified that
appellant put his fingers in her vagina. Appellant flatly denied it. Witnesses testified that E.G. was
mixed up and had reasons to lie; Carol admitted getting E.G. to lie about their place of residence. 
Other witnesses testified that E.G. was generally truthful and that her behaviors were consistent with
truth-telling. Nauert and Jansky testified that E.G.'s behavior and physical and emotional condition
were consistent with sexual assault having occurred, though Nauert conceded that her behavior and
physical and emotional condition were also consistent with sexual assault not having occurred. 
Appellant admitted to having been convicted of theft by check in 1992 and having his probation
revoked for probation violations. Carol said appellant offered to take counseling to avoid
prosecution. Appellant, though, said Detective McMiller offered him counseling to avoid
prosecution, but appellant refused. McMiller denied offering counseling. The jury had to make
several credibility choices. We cannot say that their choices render their verdict so contrary to the
overwhelming weight of the evidence as to be unjust. We overrule point one.



CONCLUSION


 Having overruled both points of error, we affirm the conviction.



 

 Jan P. Patterson, Justice

Before Chief Justice Aboussie, Justices Yeakel and Patterson

Affirmed

Filed: July 26, 2001

Do Not Publish

1. E.G.'s age at the time of the offense is uncertain. At the time of trial in June 2000, she was
ten years old and had just completed fifth grade. There was no evidence of a particular date for the
offense; the indictment recited that it occurred on or about February 1, 1998. E.G. testified that it
occurred sometime when she was in second, or possibly third, grade.
2. Other than the occurrence of the assault, the biggest difference appellant had with E.G.'s
testimony about the events was her recollection of a telephone on the kitchen table; appellant said
the phone was in the living room.
3. The charges also include elements regarding age and marital status. There is no dispute that
the evidence satisfies the age and marital status elements.

 Because the excluded evidence confuses the issues, is highly prejudicial, has little
probative value, and was cumulative on the issues appellant sought to introduce it, we conclude that
the court did not abuse its discretion by excluding it. We overrule point two.

 By his first point of error, appellant contends that the evidence is factually ins