# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-00-00497-CR

**Bobby Garcia, Appellant**

v.

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 167TH JUDICIAL DISTRICT, NO. 0991372, HONORABLE MICHAEL LYNCH, JUDGE PRESIDING

A jury convicted Bobby Garcia of the aggravated sexual assault of E.G., his niece.[1]

The district court assessed punishment at ten-and-a-half years in prison. We affirm the judgment.

### BACKGROUND

E.G. and appellant told nearly identical versions of the events surrounding the assault.

They essentially diverge only where E.G. claims the assault occurred and appellant denies it.[2] E.G.

---

[1] E.G.'s age at the time of the offense is uncertain. At the time of trial in June 2000, she was ten years old and had just completed fifth grade. There was no evidence of a particular date for the offense; the indictment recited that it occurred on or about February 1, 1998. E.G. testified that it occurred sometime when she was in second, or possibly third, grade.

[2] Other than the occurrence of the assault, the biggest difference appellant had with E.G.'s testimony about the events was her recollection of a telephone on the kitchen table; appellant said the phone was in the living room.

was staying overnight with appellant; no one else was at the house that night. When appellant asked where E.G. wanted to sleep, she elected to sleep in his bed. Appellant testified that he went to sleep and next remembers waking up around 7 or 7:30 a.m. to find E.G. watching television; she said she could not sleep. He poured a bowl of cereal for her and they went on with their day.

E.G.'s testimony added details about the offense. She said she chose to sleep in the bed because it was more comfortable, not knowing appellant was going to sleep there, too. She said that she thought appellant had fallen asleep, but then he put his hand under her panties. He put his fingers into her vagina and moved them, producing a "watery" sound. He was breathing a little harder, "kind of panting"; after about a minute, he stopped. E.G. said he never opened his eyes. She got up, went to the bathroom, then went to the kitchen for the rest of the night. She thought about calling her mother, but did not know where to call. E.G. said she felt uncomfortable. She did not say anything to appellant about it the next morning because she was scared.

The parties had similar, additional discrepancies regarding another incident that occurred about a year later. E.G. was staying with appellant and his girlfriend, Roxana. E.G. was upset when they did not take her to a children's restaurant and amusement center because it was about to close for the night. Around 11 p.m., after a minor disagreement with appellant, Roxana went to bed. Appellant and E.G. kept watching television. E.G. testified that she was sitting on appellant's leg on a chair and watching "Saturday Night Live" ("SNL"); appellant did not recall sitting on a chair that night. Appellant awakened Roxana half an hour later, saying that E.G. was crying and inconsolable. Appellant and Roxana testified that E.G. was upset because she wanted her mother and they could not reach her. In E.G.'s version, after Roxana left, appellant was asleep and

2

breathing hard, but kept putting his hand on top of her jeans; she said he got close to between her legs, but she kept moving his hand away, about two or three times. She said appellant never opened his eyes. When she got up and sat on the couch, appellant got up and went to bed in his room. E.G. said appellant appeared tired, but not particularly happy, sad, or mad. Roxana agreed that appellant was tired, but also said he was frustrated because he could not get E.G. to stop crying. Roxana said she had more success calming the child. E.G., however, said she cried a bit after appellant left, but that no one came to see about her. E.G. said she stayed up all night. Carol, E.G.'s mother and appellant's sister, testified E.G. was crying when she picked her up the next morning, but she seemed fine; E.G. said she missed her mother. Carol said appellant and Roxana told her that E.G. had thrown a fit the night before, demanding to be taken home, but no one knew where to reach her. Carol said E.G.'s behavior, combined with Roxana and appellant's story, struck her as odd.

These incidents came to light in September 1999 when E.G. did not want to stay overnight with appellant. He, Roxana, E.G., Carol, and Barbara (Carol and appellant's mother) were returning from a funeral in McAllen. After the long drive, they went to Carol's boyfriend's house. Roxana and appellant offered to watch E.G. if Carol wanted to spend the night at her boyfriend's house. E.G. got upset, said that she did not want to stay with appellant, and insisted that Carol take her home. Carol testified that, on the way home, she asked E.G. what was wrong, and E.G. told her about the "SNL incident." In Carol's version there were some different details. She said that E.G. told her appellant slammed the door on his way into the bedroom. Carol also said that E.G. told her that after a while, she went and slept in the bed with appellant and Roxana, but also that she stayed awake all night crying.

3

Carol testified that she was not sure what to do after this report. She said that, because of the volatile nature of her relationship with her family, she hesitated to report E.G.'s outcry; she did not think Barbara would believe E.G. Carol sent E.G. to Indianapolis to live with E.G.'s father, his wife, and their three children. She did so even though E.G. had never met him and he had beaten Carol when they were together; Carol said she believed that he had not abused his new family and that E.G. would be better off living with her father in a relatively stable environment.

After E.G. was with her father, Carol reported the abuse to Child Protective Services ("CPS"). While CPS tried to interview E.G. from Indianapolis, Detective Johnny McMiller, an Austin policeman, called appellant, who had heard rumors from friends that Carol was accusing him of the abuse. Appellant went voluntarily to talk with the policeman about the report, saying he wanted to clear up the controversy. Appellant's responses were much like his testimony—he admitted sleeping in the same bed as E.G. and having her sit on his lap, but he denied sexually assaulting her. The chief discrepancy between Detective McMiller's memory and appellant's recollection is that appellant believed the detective offered him counseling if he would admit guilt, and McMiller denied making the offer; the audio portion of the videotape of the interview was unintelligible and therefore unhelpful on this issue. Carol testified that appellant called her offering to undergo counseling to avoid prosecution; appellant denied calling her or bargaining for counseling.

When E.G. returned from Indianapolis after six months, she went to the Travis County Child Advocacy Center ("the Center") where she was interviewed by Cynthia Cantu, a forensic investigator. Cantu said E.G. told her that appellant touched the inside of her vagina with his hand while they were in his bed. Cantu said E.G. was soft-spoken, but open, and that E.G. got teary-eyed

4

and her voice cracked when describing the incident. E.G. did not have access to her mother during the interview, and the investigator did not talk to Detective McMiller during the interview. Miriam Jansky, a therapist at the Center who treated E.G. briefly, said E.G. was tight-lipped, jumpy, and had trouble sleeping. Jansky said E.G. was very angry at appellant for the abuse and at Carol for creating the environment in which it happened—that is, E.G. was angry that so many people other than her mother provided child care for her. Jansky also said E.G. was angry that Carol had so many people over to their house; she wanted more time with her mother.

Witnesses testified that E.G. and appellant exhibited behaviors consistent with the allegations. Psychologist William Carter (who did not examine E.G.) testified that the details E.G. gave about the assault—the sound appellant's fingers made, his heavy breathing—lent credibility to her outcry. Carter and psychologist Jeff Ezell agreed that a delay before the outcry is not unusual; young children, particularly those abused by family members they like, hesitate to make an outcry because they are confused by what happened, fear they will not be believed, and fear getting someone they like in trouble. Jansky testified that E.G.'s anger, jumpiness, insomnia, and hesitance to talk about the incident were consistent with the allegations. Appellant's behavior, too, was not surprising for an abuser. Carter said people who enjoy sex with children also can have normal sexual relationships with adults. Carter said that pedophiles often "groom" their targets by giving them gifts and taking them places to gain their trust; E.G. testified that, though she did not get along with appellant when she was very young, he started being nice to her about a year or two before the first assault. Detective McMiller said that appellant's acknowledgment of the facts surrounding the assault was not unusual; he said many people tell the truth right up to the point where they get in trouble.

5

Other witnesses testified that E.G. might be making these allegations to effect Carol's revenge against her family. Even E.G. described her mother's relationship with appellant as "a rollercoaster." Many witnesses testified that appellant was free and blunt with his criticism of Carol's career, lifestyle, and child-rearing methods. Carol testified that she was an exotic dancer and that, when E.G. was young, she had been a nude masseuse who occasionally performed sexual acts for money; she denied doing the latter for years. Carol said that her mother also did not agree with her lifestyle because her mother was more religious whereas Carol was more "open-minded." Barbara said appellant called Carol a whore and a prostitute. Barbara said appellant nixed Carol moving in with Barbara, appellant, and Roxana because Carol lacked personal and monetary discipline.

Other testimony also concerned the credibility of E.G. and Carol. Immediately after denying that she would instruct E.G. to lie about these accusations, Carol herself testified that she had gotten E.G. to lie about their residence in order to stay at a good school. Though E.G.'s teacher described her as a truthful child who would even inculpate herself, a family friend described her as a "mixed-up kid." The same friend said Carol was lying if she testified that E.G. went to the same Austin school for six years because he remembered picking up E.G. from different schools. Though Carol insisted that she moved E.G. to Indianapolis for protection, others said she told them that she was moving E.G. there to provide the stability that she could not. There was also a discrepancy in perception of an incident on the return trip from the funeral in McAllen; during a midtrip change in drivers, E.G. said she saw appellant hit Roxana as they walked behind the car, but Roxana said she hit him lightly because she was upset with the way he was driving her car.

6

Witnesses also testified to the genuineness of appellant's concern for E.G. Friends and relatives said he never showed abnormal interest in the child. They also testified regarding a party at which he roused Carol from a drunken stupor to insist that E.G. be taken somewhere that she would not be surrounded by drunken men; witnesses said that appellant seemed more concerned with E.G.'s welfare than Carol was. They testified that he and Roxana watched after E.G. overnight many times, sometimes on the spur of the moment, sometimes for many days in a row when Carol dropped her off and disappeared without telling them where she was going or how long she would be gone.

There is no physical evidence substantiating the assault. Dr. Beth Nauert testified that, under the circumstances, none was expected; the assault described was a digital penetration of E.G.'s sexual organ that occurred more than a year before E.G. reported it in September 1999. E.G.'s physical condition was consistent both with assault and lack of assault.

## DISCUSSION

By his second point of error, appellant contends that the court erred by excluding evidence that would have allowed him to explain E.G.'s knowledge of sexual matters. Appellant contends that evidence of Carol's livelihood also would have allowed him to explain his criticisms of Carol and Carol's animosity toward him.

A defendant has a fundamental right to present evidence of a defense as long as the evidence is relevant and is not excluded by an established evidentiary rule. *See Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). A court can exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, misleading the jury, or needless

presentation of cumulative evidence. *See* Tex. R. Evid. 403. We will review the trial court's decision to bar the admission of evidence under an abuse of discretion standard. *See Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000); *Montgomery v. State*, 810 S.W.2d 372, 390-91 (Tex. Crim. App. 1990).

The trial court determined that the evidence adduced outside the jury's presence regarding Carol's occupations was merely character evidence and irrelevant, and that any probative value was substantially outweighed by the prejudicial effect. Appellant challenges this exclusion, not because the evidence bears directly on the elements of the offense charged, but because the evidence illuminates E.G.'s ability and motivation to fabricate testimony about the offense.

Before examining the district court's decision, we note initially that the decision is supported by another evidentiary rule and that the record contains other, less inflammatory evidence serving the purported function of the excluded evidence. The trial court's decision to exclude the evidence of the victim's mother's work in sexually oriented businesses is supported by Texas Rule of Evidence 608(b); evidence regarding a witness's sexual activities or misconduct, absent a criminal conviction, is not admissible to impeach or to show bad character of the witness. *See* Tex. R. Evid. 608(b); *Ramos v. State*, 819 S.W.2d 939, 941-42 (Tex. App.—Corpus Christi 1991, pet. ref'd). We further note that the record reflects that appellant could and did present his theories through less prejudicial evidence. The jury heard from several sources, including Carol and E.G., that Carol had a stormy relationship with appellant. The jury heard that Carol often passed E.G. off to babysitters in order to spend time with boyfriends, that Carol passed out leaving E.G. in the company of drunken men, and that appellant called her a whore. The jury also heard that Carol was financially

8

irresponsible and that she moved around quite a bit. Finally, the jury heard that appellant prevented her from moving in with their mother.

Reviewing the merits of the district court's decision, we conclude that the court did not abuse its discretion by finding the evidence not relevant or probative. The propounded evidence—that Carol is an exotic dancer who eight years before worked as a nude masseuse and occasionally performed sexual acts for money—does not show that E.G. was able to lie about the sexual assault knowledgeably because she had unusual access to sexual knowledge. There is no evidence that E.G. observed sexual activity as a result of Carol's occupation or otherwise. There is no evidence that E.G. knew about Carol's previous occupation or her current occupation as an exotic dancer. The evidence instead is that E.G. had not been in the club where Carol performed. In sum, the evidence offered did not show a connection between Carol's employment and E.G.'s knowledge of sexual activity. Though evidence that Carol had animosity toward appellant might illuminate a motivation for fabrication, evidence that Carol had been a prostitute had no probative value regarding her or E.G.'s animosity toward appellant. Appellant's criticism of Carol has probative value, but the *justification* for that criticism has no bearing on the elements of the offense or E.G.'s ability or motivation to lie. Indeed, appellant's defensive position seems stronger without the evidence; jurors would probably impute more rightful animosity to Carol stemming from appellant's calling her a whore if they did not know that she actually had committed acts of prostitution.

We also conclude that the district court did not abuse its discretion by finding the minimal probative value of the evidence substantially outweighed by the risk of confusion of the issues or unfair prejudice. Evidence that a sexual assault complainant's mother worked in sexually

9

oriented businesses risks distracting the jury from the elements of the offense; jurors could be tempted unfairly to impute Carol's actions to her daughter. Further, evidence of sexual misconduct inherently creates a substantial danger of unfair prejudice. *See Montgomery*, 810 S.W.2d at 397.

Because the excluded evidence confuses the issues, is highly prejudicial, has little probative value, and was cumulative on the issues appellant sought to introduce it, we conclude that the court did not abuse its discretion by excluding it. We overrule point two.

By his first point of error, appellant contends that the evidence is factually insufficient to support the jury's verdict; he concedes that the evidence is legally sufficient. Appellant was charged with intentionally and knowingly penetrating E.G.'s sexual organ with his finger or, alternatively intentionally and knowingly, with intent to gratify his sexual desire, touching the genitals of E.G.[3] When reviewing the factual sufficiency of the evidence, appellate courts consider all the evidence in a neutral light and reverse only if the verdict is so contrary to the overwhelming weight of the evidence as to be unjust. *See Johnson v. State*, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000); *Clewis v. State*, 922 S.W.2d 126, 134 (Tex. Crim. App. 1996). We must accord the jury's verdict due deference and should not, in effect, become the thirteenth juror. *See Clewis*, 922 S.W.2d at 133. We cannot interfere with the jury's resolution of conflicts in the evidence or pass on the weight or credibility of testimony; unless the record clearly reveals that a different result was appropriate, we defer to the jury's determination concerning what weight to give contradictory testimonial evidence

---

[3] The charges also include elements regarding age and marital status. There is no dispute that the evidence satisfies the age and marital status elements.

because the jurors' resolution of such conflicts often turns on an evaluation of credibility and demeanor by the jury. *See Johnson*, 23 S.W.3d at 8.

Factually sufficient evidence supports the judgment. E.G. plainly testified that appellant put his fingers in her vagina. Appellant flatly denied it. Witnesses testified that E.G. was mixed up and had reasons to lie; Carol admitted getting E.G. to lie about their place of residence. Other witnesses testified that E.G. was generally truthful and that her behaviors were consistent with truth-telling. Nauert and Jansky testified that E.G.'s behavior and physical and emotional condition were consistent with sexual assault having occurred, though Nauert conceded that her behavior and physical and emotional condition were also consistent with sexual assault not having occurred. Appellant admitted to having been convicted of theft by check in 1992 and having his probation revoked for probation violations. Carol said appellant offered to take counseling to avoid prosecution. Appellant, though, said Detective McMiller offered him counseling to avoid prosecution, but appellant refused. McMiller denied offering counseling. The jury had to make several credibility choices. We cannot say that their choices render their verdict so contrary to the overwhelming weight of the evidence as to be unjust. We overrule point one.

# CONCLUSION

Having overruled both points of error, we affirm the conviction.

_____

Jan P. Patterson, Justice

Before Chief Justice Aboussie, Justices Yeakel and Patterson

Affirmed

Filed:   July 26, 2001

Do Not Publish

12